

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 27, 2015

BY HAND AND ECF

The Honorable Richard J. Sullivan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1010
New York, New York 10007

      Re:    *Jason Goldfarb* v. *United States*, 15 cv. 959, S1 10 Cr. 056 (RJS)

Dear Judge Sullivan:

      The Government respectfully submits this letter in opposition to Jason Goldfarb's petition for a writ of error *coram nobis*.

      Goldfarb was at the center of a conspiracy in which he and others obtained, disseminated, and traded on material, nonpublic information that had been misappropriated in violation of duties of trust and confidence and in exchange for a benefit.  As a result of that conduct, Goldfarb was arrested, pursuant to a federal complaint, on or about November 5, 2009, and indicted by a grand jury sitting in this District on or about January 21, 2010.  Goldfarb eventually pled guilty to two counts of insider trading pursuant to a plea agreement. He was sentenced to 36 months' incarceration, three years of supervised release, $1,103,131 in forfeiture, and a fine of $32,500. Goldfarb has served his custodial sentence, has negotiated a settlement with respect to the court-ordered forfeiture, and has been paying $100 a month toward his fine.

      Goldfarb now petitions this Court to vacate his judgment so as to alleviate the ongoing obligation to repay that fine, relying on the writ of *coram nobis* as a basis for relief.  In support of his petition, Goldfarb claims that he has suffered a grave injustice because he received a fine as part of his sentence, while none of his co-conspirators (including those who went to trial rather than pled guilty) received a fine.  Goldfarb, however, points to no irregularities—much less any constitutional infirmities—in any of the proceedings below, nor does he suggest that there was anything unlawful about his sentence, improper about his plea, or ineffective about his counsel.  Because Goldfarb's claim falls far short of the standard necessary for the extraordinary remedy of *coram nobis*, this Court should deny his petition.

**Background**

*The Scheme to Defraud*

As the Court is aware, the conduct underlying Goldfarb's conviction relates to an insider trading scheme in which two Ropes & Gray attorneys misappropriated material, nonpublic information from the clients of their law firm in exchange for cash bribes. Goldfarb played a critical role in this conspiracy as the intermediary between the two Ropes & Gray attorneys, Brien Santerlas and Arthur Cutillo, and Zvi Goffer, the stock trader who traded on and further tipped the inside information to downstream tippees Michael Kimelman, Emanuel Goffer, David Plate, and Craig Drimal.

Cutillo had been a roommate of Goldfarb's, and Goldfarb recruited him to join the conspiracy. Between approximately July 2007 and approximately June 2008, Goldfarb repeatedly pressed Cutillo and Santarlas for inside information, repeatedly received inside information from them, and repeatedly disseminated the inside information to Zvi Goffer. Goldfarb kept the scheme running by constantly prodding the attorneys to obtain new inside information based on their work at the law firm. For example, as Santarlas testified at the trial of Goldfarb's co-defendants, Goldfarb instructed Cutillo and Santarlas to "keep their ears open" for information regarding new deals or mergers. (Goffer Tr. 449).[1] Indeed, Goldfarb's role was so vital to the existence of the conspiracy that Goffer paid Goldfarb the same amount in cash bribes that he paid to the two Ropes & Gray attorneys—the individuals supplying the inside information. Additionally, to try to conceal the insider trading scheme, Goldfarb obtained from Goffer and then supplied to Cutillo and Santarlas multiple sets of prepaid cellular telephones which allowed them to communicate while evading detection by law enforcement.

*The Charges*

In connection with the insider trading conspiracy, Goldfarb was charged by criminal complaint on or about November 4, 2009, and arrested the next day. On or about January 21, 2010, he was indicted, in four counts, along with co-conspirators Zvi Goffer, Arthur Cutillo, Michael Kimelman, Emanuel Goffer, and David Plate. On or about April 7, 2011, the grand jury returned a superseding indictment charging Goldfarb in five counts. Two weeks later, on or about April 21, 2011, Goldfarb pled guilty to Counts One and Three of the superseding indictment, which charged him, respectively, with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.[2] Goldfarb's co-defendants Zvi Goffer, Michael

---

[1] "Goffer Tr." refers to the trial transcript in *United States* v. *Zvi Goffer*, 10 Cr. 56 (RJS), which began on May 16, 2011 and concluded on June 13, 2011.

[2] Goldfarb correctly notes in his petition that he participated in proffer sessions with the Government. (Pet'n at 2). As detailed in the Government's sentencing memorandum in this case, from the outset of that ultimately fruitless process, which was conducted at the urging of defense counsel following Goldfarb's indictment and arrest, the Government advised Goldfarb that a cooperation agreement was highly unlikely in his case because it was doubtful he could

2

Kimelman, and Emanuel Goffer went to trial and were convicted, of all counts, on or about June 13, 2011.  All of Goldfarb's co-defendants, including those who pled guilty and those who were convicted at trial, were sentenced before the end of 2011.  The judgments in all of the co-defendants' cases are—and have been since their entry dates—publicly available.

### *Goldfarb's Plea and Sentence*

Goldfarb's April 21, 2011 guilty plea was entered pursuant to an agreement with the Government.  A copy of the plea hearing transcript is attached as Exhibit A.

During his plea, in open court and under oath, Goldfarb accepted responsibility for his conduct, expressed satisfaction with his attorney, and acknowledged the statutory penalties to which he was subject as a result of his plea—which included the potential financial penalties of restitution, forfeiture, and/or a fine. (*See* Ex. A at 31-39, 5, and 16-17, respectively). Specifically, Your Honor detailed the maximum penalties that Goldfarb faced in connection with his conviction:

> THE COURT:  I want to go over with you very briefly the maximum penalties you face for these crimes, all right? Count 1, which is the conspiracy count, carries a maximum term of imprisonment of five years.  It carries a maximum term of supervised release of three years, a maximum fine of the greatest of either $250,000 or twice the gross pecuniary or financial gain derived from the offense or twice the gross pecuniary or financial loss to persons other than yourself that resulted from the offense.  Whichever is greatest of those three, that is the maximum penalty.
>
> In addition, as part of your sentence, I can order restitution to any person or entity that was injured as a result of your criminal conduct.  I can also order you to forfeit any and all proceeds derived from the criminal conduct.  Finally, I must order you to pay a $100.00 special assessment.  That is separate from any fine or restitution or forfeiture.
>
> Count 3, which is the securities fraud count, carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of three years, a maximum fine of the greatest of either $5 million or again twice the gross gain or twice the gross loss that resulted from the offense.  The difference between this one and the other count is it is 250, or those other two alternatives, it is 5 million or the other two alternatives.
>
> In addition, I can also order that you pay restitution.  I can also order you to forfeit any and all proceeds.  Again there is a separate $100.00 special assessment for this offense.  Do you understand that?

---

furnish substantial assistance. (*See* Government's Sentencing Memorandum for Defendant Jason Goldfarb, Dkt. No. 235).

THE DEFENDANT:  I understand.

(Ex. A at 16-17).

Goldfarb further acknowledged that even though his agreement included a stipulated range of imprisonment terms pursuant to the United States Sentencing Guidelines (the "Guidelines"),[3] he understood that his ultimate sentence was up to the discretion of the Court. Ex. A at 20.  The Court then detailed the factors that would be considered in determining the sentence.  (Ex. A at 20-26).

Goldfarb was sentenced approximately four months later, on or about August 19, 2011. A transcript of the August 19, 2011 sentencing proceeding is attached as Exhibit B.  Prior to sentencing, Goldfarb was given the opportunity to review and raise any objections to the Pre-Sentence Report prepared by the United States Probation Office of for the Southern District of New York (the "PSR")—a document that includes not only the mandatory penalties that Goldfarb faced, but the potential penalties to which Goldfarb had stipulated he was exposed as part of his plea agreement.  During the sentencing proceeding, Goldfarb was given the opportunity to raise any remaining objections to the PSR.  None were raised.  (Ex. B at 4-5).

In connection with sentencing, this Court reviewed nearly 60 letters submitted to the Court on Goldfarb's behalf, as well as submissions from the Government and defense counsel. (Ex. B at 74-75).  During the sentencing, a number of people spoke on Goldfarb's behalf, including multiple members of Goldfarb's family, as well as a lifelong friend, his fiancée, his employer, clients whom Goldfarb had helped through difficult times in their lives in his role as an attorney, and a forensic psychologist.  (Ex. B at 16-58). Goldfarb also spoke on his own behalf.  (Ex. B. at 64-69).  This Court, after acknowledging the outpouring of support for Goldfarb, expressed some frustration at Goldfarb and his counsel's attempt to recast Goldfarb's crime as one of necessity rather than greed, and emphasized that the Government's proof at the trial of Goldfarb's co-defendants—including wire intercepts between Goldfarb and his co-conspirators—simply belied that theory.  In support of its view of the crime and the true motivation behind Goldfarb's conduct, the Court asked the Government to play one of the exhibits that had been played during the trial.  The Government did so, in open court.  (Ex. B. at 83).  Below is the transcript of an excerpt of that call:

…

JASON GOLDFARB:           The other one could end up being a big one, you know?

ZVI GOFFER:                       Dude, the other one will be… if, if, if the other one happens it might be the big, it's going to be one of the biggest… It'll

---

[3] Pursuant to the Pre-Sentence Report (the "PSR"), a copy of which has been provided to the Court as Exhibit C to this letter, the stipulated Guidelines range included a fine range of $7,000 to $5,000,000.  *See* Ex. C. at ¶7g.  Exhibit C will not be filed on ECF because it is under seal.

|  |  |
|---|---|
|  | be, it'll be I think it could be almost the same size as the first one. |
| JASON GOLDFARB: | That's fucking awesome. |
| ZVI GOFFER: | It (UI) I mean look again I'm just specu… That's just my speculation. I don't know where, where it would go, you know? But if I'm right then it, you know, it, it, it would be, it could be a big one. (UI) it would be good. It would be, it would be a good thing. |
| JASON GOLDFARB: | All right, dude. Let's hope. Let's hope. Fingers crossed brother. |
| ZVI GOFFER: | Yeah, just yo, look like, like you know that was a, you know a great catch by him. It means guy keeping his ears wide open, it's perfect. |
| JASON GOLDFARB: | Dude. Wide fucking open. |
| ZVI GOFFER: | Wide open. You know now, now we're (UI) |
| JASON GOLDFARB: | (UI) that was my thing too, dude. That was me talking, that's me drilling it into them. |
| ZVI GOFFER: | Good. I know, I know that. |
| JASON GOLDFARB: | Dude, the last one, the last one was the same thing. The last one would have never happened if I don't press them and drill them every single time and they don't know just to keep their fucking ears open, you know? |
| ZVI GOFFER: | You know what though this one weird because this one just it was a slip of the tongue. |
| JASON GOLDFARB: | I know. No.  It's fucking great cause there's no, there's… It's like a free roll, you know? |

5

| | |
|---|---|
| ZVI GOFFER: | Exactly. You can try, you can try to link me with that one forever. There's no way to do anything close to it, you know, it's beautiful. So we'll stick to it. |
| JASON GOLDFARB: | (IA) |
| ZVI GOFFER: | Let, let it happen, I mean it acted, today it acted like you know, it acted today like in a way that only stocks that are going away act. You know you got one guy just sitting on the bid never leaving. He just sat there the whole day. |
| JASON GOLDFARB: | Yeah. And also, and also fucking uh you know the closer we get to these things the more we (UI) you know that's what they always said. |
| ZVI GOFFER: | Oh yeah no that's exactly right and uh you know look I again I, I wish that you know if, if they were doing it, you know, we would know better we'd probably have four, four times the positions. |
| JASON GOLDFARB: | Yeah, (UI) listen (UI) straight up. |
| ZVI GOFFER: | What? |
| JASON GOLDFARB: | They tell you straight up what the deal is so that you know like how bad (IA) |
| ZVI GOFFER: | (IA) Look, you know, you know, we can make a lot of money; we already have made a lot of money together. We can make a lot more money- |
| JASON GOLDFARB: | Ah, no, dude. |
| ZVI GOFFER: | We can make a lot more money. |
| JASON GOLDFARB: | (UI) millions (UI) |
| ZVI GOFFER: | What? |
| JASON GOLDFARB: | I said we're talking millions if that shit happens. |

| | |
|---|---|
| ZVI GOFFER: | Oh yeah, easily. We should, we should- |
| JASON GOLDFARB: | We should… Every one of us should be set for life within a year or two if things are played right. |
| ZVI GOFFER: | If, if, if… Right, if there are big deals out there then absolutely right. |
| JASON GOLDFARB: | Dude we should never I mean we could work it through whatever, but we should never have to worry again. |
| ZVI GOFFER: | I, I, I, I don't see that if, if deals come back and things get active, you know, you know low balling, I don't see why, you know, we each, I mean each of you guys, you know, should take between two hundred fifty and five hundred cash, minimum, that's the low ball. You know and that's the low, low, low-ball number. |
| JASON GOLDFARB: | Yeah, when it's going to be like the other one where you can move all fucking in and we all make millions on one, you know? |
| ZVI GOFFER: | That's, you know what, that's the one I'm waiting for because that will happen. |
| JASON GOLDFARB: | (UI) |
| ZVI GOFFER: | It would happen last year if, if, if, if we had started this a year earlier- |
| JASON GOLDFARB: | We'd all be millionaires. |
| ZVI GOFFER: | Yeah. Cause it would have happened. Jeez. It would have happened last year three times. |
| JASON GOLDFARB: | I know.[4] |

---

[4] The transcript of this call, which took place on or about February 1, 2008, was attached as Exhibit A to the Government's sentencing submission in Goldfarb's case. (*See* Dkt. No. 235).

…

After this call was played at the sentencing hearing, the Court announced its intention to sentence Goldfarb to 36 months in prison, a three year term of supervised release, approximately $1.13 million in forfeiture, and a fine of $32,500. The Court then asked Goldfarb to stand, imposed the sentence that had been previewed, and repeated that sentence again.

Goldfarb filed a timely notice of appeal. On or about March 16, 2012, the Second Circuit issued an Order stating that if Goldfarb did not file a brief on or before March 30, his appeal would be dismissed without prejudice. No brief was filed, and, on April 30, 2012, the Second Circuit issued a mandate dismissing Goldfarb's appeal. Nor did Goldfarb file a habeas petition pursuant to 28 U.S.C. § 2255.

Goldfarb served his custodial sentence, and was released from prison on or about August 30, 2013. He is currently serving his term of supervised released, and has worked out a settlement for his forfeiture obligations. On or about March 24, 2014, approximately seven months after his release, Goldfarb made the first $100 installment toward his fine, and continues to pay it monthly. Goldfarb now petitions for a writ of error *coram nobis* in which he asks this Court to vacate the judgment to "correct a fundamental error and prevent an injustice." (Pet'n at 1).

## **Argument**

Because Goldfarb has identified neither error nor any injustice in his conviction or sentence, this Court should deny his petition.

### *Applicable Law*

A writ of error *coram nobis* is an "extraordinary remedy" that should be allowed only in unique and limited circumstances. *United States* v. *Morgan*, 346 U.S. 502, 511 (1954); *accord United States* v. *Denedo*, 556 U.S. 904, 911 (2009). It "is essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of *habeas corpus*." *Fleming* v. *United States*, 146 F.3d 88, 88-90 (2d Cir. 1998) (*per curiam*).

Recognizing this, the Second Circuit has made plain that the writ is not a "substitute for appeal, and relief under the writ is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." *Foont* v. *United States*, 93 F.3d 76, 78 (2d Cir. 1996) (internal quotations and citations omitted); *see also United States* v. *George*, 676 F.3d 249, 254 (1st Cir. 2012) (observing that "successful petitions for *coram nobis* are hen's-teeth rare"). Specifically, in order to obtain *coram nobis* relief, a petitioner must demonstrate that "'1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ.'" *Fleming* v. *United States*, 146 F.3d at 90 (quoting *Foont*, 93 F.3d at 79).

The need to cabin the writ's use derives from the interest in finality of criminal judgments, which the writ of *coram nobis* threatens. *See United States* v. *Denedo*, 556 U.S. at 911 (explaining importance of "confin[ing] the use of *coram nobis* so that finality is not at risk in a great number of cases"); *United States* v. *Keane*, 852 F.2d 199, 202 (7th Cir. 1988) ("The norm of finality . . . is the background for understanding the writ of error *coram nobis*. . . . Because frequent use of such a writ would discard the benefits of finality, it has been reserved for compelling events."). Correspondingly, when a court reviews a petition for a writ of error *coram nobis*, "[t]he proceedings leading to the petitioner's conviction are presumed to be correct, and 'the burden rests on the accused to show otherwise.'" *Foont* v. *United States*, 93 F.3d at 78-79 (quoting *United States* v. *Morgan*, 346 U.S. at 512); *see also Foreman* v. *United States*, 247 F. App'x 246, 248 (2d Cir. 2007) ("In reviewing a petition for the writ, this Court presumes that the proceedings were correct, and the burden of showing otherwise rests on the petitioner.").

As the Second Circuit has made clear, delay in seeking relief is an independent basis for denying a *coram nobis* petition. *See, e.g.*, *Foont*, 93 F.3d at 79-80; *see also, e.g.*, *United States* v. *Hyun Ahn*, No. 02 Civ. 8031 (JFK), 2003 WL 21910855, at *1, 3 (S.D.N.Y. Aug. 8, 2003) (barring *coram nobis* relief after approximately four-year delay), *aff'd*, 96 Fed. Appx 43, 2004 WL 962933 (2d Cir. May 3, 2004). That is because, while "the time for filing a petition is not subject to a specific statute of limitations, . . . an error of constitutional dimension at the time of plea or sentence renders a conviction voidable, not void, and *coram nobis* relief may be barred by the passage of time." *Foont*, 93 F.3d at 79 (internal quotation marks omitted); *see also id.* at 80 (noting that entertaining a petition notwithstanding unjustifiable delay "would be an unwarranted infringement upon the government's interest in the finality of convictions"). A district court considering the timeliness of a *coram nobis* petition "must decide the issue in light of the circumstances of the individual case." *Id.* at 79. Whether a petitioner has shown "sound reasons" for delay requires a court to consider "the circumstances surrounding the petitioner's failure to raise the issue earlier rather than the government's injury that resulted from the delay." *Id.* at 80. "The critical inquiry," the Second Circuit has explained, "is whether the petitioner is able to show justifiable reasons for the delay." *Id.*

## *Discussion*

### *Goldfarb Has Not Established An Error In The Proceedings Below, Let Alone An Error "Of The Most Fundamental Character"*

Goldfarb asks that his judgment be vacated because, of the co-conspirators convicted and sentenced by this Court for crimes related to the above-described insider trading scheme, he is the only defendant to have received a fine as part of his sentence. (Pet'n at 3). Goldfarb's argument that his $32,000 fine is unjust rests on this purported disparity as well as on a detailing of his current circumstances, which include the fact that he can no longer practice law, that he is recently married, and that he is contrite about his participation in the insider trading conspiracy. (Pet'n at 2, 4-7).

Neither of Goldfarb's purported bases for relief demonstrates error, much less error of the "fundamental character" needed to warrant issuance of a writ of *coram nobis*. *Foont*, 93 F.3d at

78 (internal quotation marks omitted); *see Mansour* v. *United States*, No. 14-cv-6099 (NRB), 2015 WL 1573327, at *6-8 (S.D.N.Y. April 8, 2015). As Goldfarb does not dispute, the plea and sentencing hearings that the Court conducted in his case were painstaking and scrupulously fair in all respects, and Goldfarb—who was at all relevant times represented by counsel—repeatedly was made aware of and acknowledged the penalties, including the financial penalties, to which his criminal conduct and his plea of guilty exposed him. Moreover, the personal circumstances that Goldfarb relies upon most heavily in his petition to ground his claim of injustice—his new (then, impending) marriage and the loss of his law license—were factors of which the Court was fully informed at the time of sentencing.

As a substantive matter, Goldfarb's fine of $32,000 falls well within the Guidelines range to which he specifically stipulated ($7,000 to $5 million), and well below the statutory maximum for the insider trading counts of which he was convicted. Accordingly, pursuant to the terms of Goldfarb's plea agreement, he waived his right to even appeal the fine amount he ultimately received. The fine, moreover, was certainly justified—in fact, the fine was specifically keyed to the amount of Goldfarb's personal gain from the insider trading scheme. Among other factors that supported its imposition was that, as detailed above, Goldfarb cynically sought at sentencing to recast his crimes as ones of necessity rather than greed. Taking this and all other factors into account, the Court carefully considered what penalties were appropriate in Goldfarb's case, and explained its reasoning in part as follows:

> The conclusion that has to be drawn here is this conduct will not be tolerated. There are people around this country watching what happens in this case and other cases like it. So those engaging in this kind of conduct, they have to understand they better be careful because when they get caught they are going to be arrested, they are going to destroyed financially, they are going to be disgraced, disbarred if they are attorneys or de-licensed if they are some other kind of professional, and yes, go to jail . . . (Ex. B at 85-86).

In the absence of any error, much less a fundamental one, in the imposition of Goldfarb's sentence, the petition must be denied. *See*, *e.g.*, *Fleming*, 146 F.3d at 90-91.[5]

*Goldfarb's Justification for Delay is Not Supported by the Facts*

Wholly independent from the foregoing, the petition must also be denied for inexcusable delay. In order to obtain *coram nobis* relief, Goldfarb must show that "sound reasons exist for his failure to seek appropriate earlier relief." *Id.* at 90. "In deciding timeliness of *coram nobis*, [t]he critical inquiry is whether the petitioner knew or should have known earlier of facts underlying the claim for *coram nobis* relief." *Nangia* v. *United States*, No. 11-cv-6056 (RMB),

---

[5] While we find no authority that allows Goldfarb to challenge his conviction and sentence through a writ of error *coram nobis* on this record, it may be possible, pursuant to 18 U.S.C. § 3572(d)(3), for Goldfarb to submit a motion to the Court seeking a modification of the payment schedule, which the Court may grant if it determines that the appropriate showing, *e.g.*, changed circumstances, has been made.

2012 WL 4513477, at *3 (S.D.N.Y. Oct. 2, 2012) (internal quotation marks omitted).  Courts have found relief improper in light of delays of only a few years.  *See Foont*, 93 F.3d at 80 ("[T]o entertain Foont's petition notwithstanding his unjustifiable [five-year] delay would be an unwarranted infringement upon the government's interest in the finality of convictions."); *Nordahl* v. *United States*, 425 Fed. Appx. 35, 36 (2d Cir. 2011) (noting that three-and-a-half-year delay would be unjustifiable); *Mastrogiacomo* v. *United States*, No. 90-cr-565 (KTD), 2001 WL 799741, at *2 (S.D.N.Y. July 16, 2001) (denying petition in light of three-year delay).

Goldfarb's fine was imposed on or about August 19, 2011, and he did not file his petition for relief until February 6, 2015—three and a half years later.  In his petition, Goldfarb claims that he did not become aware of his fine until he had served his prison term and reported to the Probation Office.[6]  (Pet'n at 3).  This is not credible.  Goldfarb's plea agreement and the PSR both alerted him to the possibility that he would receive a fine within the stipulated Guidelines range.  During the sentencing hearing, the Court expressly informed Goldfarb not once but *twice* that the fine amount was $32,500.  Additionally, the final judgment—which issued on August 22, 2011, has been available on ECF since on or about that date, and was served on Goldfarb at or about the time of its filing—specifically states that Goldfarb is subject to a fine of $32,500.  A copy of that judgment is attached as Exhibit D.  Finally, all of Goldfarb's codefendants were sentenced by the end of 2011.

Under these circumstances, there is simply no basis for excusing the three-and-a-half-year delay between the imposition of the fine and the relief that Goldfarb now seeks.  His petition must be denied.

* * * * *

The hardships that Goldfarb identifies as reasons for granting him the extraordinary relief of a writ of *coram nobis* are ones directly resulting from his criminal conduct—conduct that he engaged in with the hope of finding an easy path to wealth, knowing full well that it was illegal at the time he was doing it.  Criminal conduct and criminal convictions have consequences; many of those consequences have long ranging effects.  But if the conviction is proper and the sentence is lawful—and indeed well-considered by the Court, as they were here—those effects do not make a defendant eligible for a writ of error *coram nobis*.

---

[6] As noted above, Goldfarb was released on or about August 30, 2013.  He presumably reported to probation shortly thereafter.  He offers no explanation at all for the year and a half delay from the time of his release to the filing of this petition.

## Conclusion

      For the aforementioned reasons, this Court should deny Goldfarb's petition for a writ of error *coram nobis*.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   /s/
Brooke E. Cucinella
Assistant United States Attorney
(212) 637-2477

*cc*: Jason Goldfarb (*via* email and ECF)