# Exhibit B

18J6GULS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        10 CR 56(RJS)

5    JASON GOLDFARB,

6                   Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         August 19, 2011
9                                        10:00 a.m.

10
     Before:
11
                    HON. RICHARD J. SULLIVAN,
12
                                         District Judge
13

14                        APPEARANCES
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   RICHARD C. TARLOWE
          Assistant United States Attorney
17
     MICHAEL L. SOSHNICK
18        Attorney for Defendant

19

20

21

22

23

24

25

18J6GULS

```
 1              (In open court; case called)
 2              THE LAW CLERK:  Appearing on behalf of the government?
 3              MR. TARLOWE:  Richard Tarlowe for the government.
 4              THE COURT:  Good morning, Mr. Tarlowe.
 5              For the defense?
 6              MR. SOSHNICK:  Good morning, your Honor.  Michael L.
 7    Soshnick.
 8              THE COURT:  Mr. Soshnick, good morning.  Mr. Goldfarb,
 9    good morning to you.  I want to say good morning to the others
10    who are here.  I am sure there are friends and family members,
11    former clients of Mr. Goldfarb and others who are interested.
12    All are welcome.  This is a public courtroom.  Everyone is
13    welcomed to be here.  I am sure you are here to support Mr.
14    Goldfarb.  I am sure your presence means a great deal to him.
15    Thank you for being here.  Many of you wrote letters and I read
16    them all.  So I want to thank you for taking the time to do
17    that.  Such letters can be helpful to help the Court get a
18    sense of the individual being sentenced.  I thank you for
19    taking the time to do that.
20              Let me say initially I apologize we're getting a late
21    start.  I think I have a reputation for punctuality.  In this
22    case I was a little late getting up here because I really did
23    want to both collect and review again some of the materials
24    that had been submitted.  So I don't lightly make lawyers or
25    others wait in court.  I know you all have things to do and
```

18J6GULS

1    important appointments and other things that are important to

2    you and rightly so.   That is the reason for the delay.   So I

3    apologize.

4              We're here for sentencing.   Mr. Goldfarb pled guilty

5    before me back in April, April 21.   I want to go over with the

6    parties what I received in connection with sentencing and if I

7    have left something out then by all means let me know.   First

8    of all, I reviewed the plea transcript from April 21.   I have

9    reviewed of course the presentence report from the Probation

10   Department, which is dated August 5th, and it is about a

11   30-page report with the recommendation of the Probation

12   Department.   I have reviewed Mr. Soshnick's submission, which

13   is dated August 11th.   That submission is just 16 pages,

14   single-spaced.   It also includes a number of attachments,

15   including approximately 50 plus letters or so as well as also a

16   report, psychiatric report, psychological summary I should say,

17   which I am sure we'll hear more about today.

18             Then I have received and reviewed the government's

19   sentencing submission, which is a nine-page, double-spaced

20   submission dated August 12th.   It also includes a number of

21   exhibits, which are transcripts of recordings that were made

22   during the course of the investigation, during the wiretap, and

23   some or most of them were played at the trial of Mr. Goffer and

24   others.   So I have reviewed those.

25             I then have an August 17th submission.   It is a

18J6GULS

1    one-page letter from Mr. Soshnick.  It principally attaches a

2    letter from Mr. Goldfarb to the Court as well as six additional

3    letters from friends, family members and clients.  So I have

4    reviewed all those as well.

5         That is what I reviewed in connection with sentencing.

6    In addition, I presided over the trial of Zvi Goffer, Emanuel

7    Goffer and Michael Kimelman.  So I have certainly heard a lot

8    of evidence and testimony related to this scheme that is the

9    subject of this sentencing today.  So I am certainly familiar

10   with the case.

11        Is there anything else I have left out, Mr. Soshnick?

12        MR. SOSHNICK:  No, your Honor.  You've been very

13   thorough and you included everything that was submitted to you

14   on behalf of my client.

15        THE COURT:  Mr. Tarlowe, anything from the

16   government's perspective that I may have left out?

17        MR. TARLOWE:  No, your Honor.

18        THE COURT:  Let's start with the presentence report.

19   The presentence report is dated August 5th and I think it is

20   very clear from your submission, Mr. Soshnick, that you

21   received a copy of the report.  There was a prior report I

22   guess as well?

23        MR. SOSHNICK:  Yes, your Honor.

24        THE COURT:  So you've reviewed this report with your

25   client?

18J6GULS

1        MR. SOSHNICK:  Yes.  I reviewed the prior report and

2   formulated objections and I reviewed the subsequent report with

3   my client.  That's correct, your Honor.

4        THE COURT:  And the objections that you've made, some

5   of them I think were already addressed in the report and so it

6   seems to me the only objections that remain relate to the

7   amount -- tell me what objections remain.

8        MR. SOSHNICK:  Your Honor, we're satisfied with the

9   manner in which the Probation Department resolved the various

10  objections that I set forth in a letter to Probation, which I

11  copied the government on.

12       THE COURT:  So that is my understanding as well.

13       Mr.Tarlowe, have you received a copy of the

14  presentence report?

15       MR. TARLOWE:  Yes, your Honor.

16       THE COURT:  Does the government have any objections to

17  it?

18       MR. TARLOWE:  No, we don't, your Honor.

19       THE COURT:  Let's start then with the guidelines

20  calculation for those who may not be familiar with how

21  sentencings work.  There are a number of factors that the Court

22  is required to consider.  We went over what those factors are.

23  One of those factors are the United States sentencing

24  guidelines.  An edition comes out each year, a little different

25  than the year before.  The point of this book is really to

1    provide some guidance to courts in imposing a sentence.  These

2    guidelines are advisory.  They are not mandatory.  There was a

3    time when they were mandatory, but they are no longer

4    mandatory.  A Court is obliged to consider these guidelines.  I

5    don't are to follow them, but I have to consider them.

6            For each crime and type of crime, there is a chapter

7    in this book that a Court is directed to go to and make certain

8    findings and upon making those findings assign a certain number

9    of points and it becomes a fairly technical and arithmetical

10   exercise.  But the point of the guidelines is to try to make

11   sure that people who are similarly situated are treated roughly

12   the same in the system of justice with the recognition that

13   wildly disparate desperate sentences undermine people's

14   confidence in the system of justice and it is on some levels

15   unfair recognizing of course that no people are exactly the

16   same or ever exactly similarly situated.

17           So we're going to spend a few moments going through

18   these guidelines.  It can be technical or at least it can sound

19   technical, but in this case I think it is fairly

20   straightforward and simple.  I don't think there is any

21   disputes what the guidelines are in this case.

22           MR. SOSHNICK:  That's correct, your Honor.

23           THE COURT:  So the guidelines calculation picks up on

24   page 12 of the presentence report.  Mr. Goldfarb pled guilty to

25   two counts, Count One and Count Three.  Those counts are

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

18J6GULS

1   grouped together under the sentences guidelines.  According to
2   guidelines there is a base offense level of eight because this
3   crime involved insider trading.  So pursuant to Section 2B1.4
4   specifically 1.4(a), eight levels are the offense level.
5   Because this offense involved profits of a little over a
6   million dollars from trades made by Mr. Goldfarb's
7   codefendants, the offense level is increased by 16 pursuant to
8   Section 2B1.1(b)(1)(l) and 2B1.4(b)(1).  So that deals in
9   adjusted offense level 24.  Because Mr. Goldfarb pled guilty in
10  advance of trial, accepted responsibility for this crime, three
11  levels are taken away, they are substracted.  That yields a
12  total offense level of 21.  Mr. Goldfarb has no prior
13  convictions so he is in criminal history category I, which is
14  the lowest criminal history category.  As a result the
15  guidelines range in this case given the offense level of 21,
16  criminal history category of six the guidelines range is 37 to
17  46 months.  So that is the guidelines calculation in the view
18  of the Sentencing Commission that is a sentence that will be
19  appropriate for a person who has those characteristics and for
20  a crime that involved those specific facts.
21          That is only one of a variety of factors that the
22  Court has to consider.  So I assume that is where we are going
23  to go now and talk about those other factors.  Many of those
24  factors were referred to and discussed both in Mr. Soshnick's
25  submissions and in the letters of friends and family members.

18J6GULS

1          So, Mr. Soshnick, I am happy to hear from you.  And

2     read your letters and all the attachments.  Anything you would

3     like to add, I am certainly happy to hear.

4          MR. SOSHNICK:  Your Honor, as you pointed out my

5     client is someone who obviously has no prior criminal history

6     of any kind of nature whatsoever.  He is an attorney and he has

7     always loved being an attorney.  He has represented many

8     clients, all of whom have appreciated the very valuable

9     services he has provided for them.  Some of those clients are

10    here today and actually want to address the Court.

11         I would indicate to the Court that unlike the others

12    who figured in this conspiracy, my client was not motivated by

13    greed but rather by need.  He was involved in a situation where

14    his father had a failing women's clothing store in Brooklyn and

15    his mother was diagnosed with cancer.  My client's father came

16    to my client and told my client that he needed financial

17    assistance.

18         THE COURT:  When was that?  That is repeated in

19    virtually every letter.  It is repeated in psychological

20    report.  It is in your letter, but it is never quite specific

21    as to when all these facts took place.

22         MR. SOSHNICK:  2007, your Honor.

23         THE COURT:  2007.  When in 2007?

24         MR. SOSHNICK:  My client tells me it was April or

25    March in 2007.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

18J6GULS

1          THE COURT:  This went on well into 2008, right?

2          MR. SOSHNICK:  The trades that were referable to my

3    client, for which my client received the aggregate sum of

4    $38,500 occurred in 2007 and just a little bit into 2008.  That

5    is correct.

6          THE COURT:  There were other certainly conversations,

7    including intercepted conversations, that indicate that this

8    was a scheme that was going on into 2008 and there were plans

9    to do more trades and much more profitable insider trades.

10          MR. SOSHNICK:  Your Honor, my client informs me that

11   he was paying for medical coverage for his mother in connection

12   with her cancer diagnosis in 2007 and 2008.  I want to just

13   indicate to the Court that unlike others who went on lavish

14   vacations and who spent a great deal of money on acquiring

15   personalty, my client did not keep a nickel, a dime or a penny

16   of the $32,500 he received.  All of it went to his parents in

17   connection with his father's failing business and his mother's

18   medical issues.  I think that puts him in a position that is

19   quite different from the other individuals who participated in

20   this conspiracy.  I think that point has been highlighted and

21   rightly so.

22          Your Honor, I would like to also bring to the Court's

23   attention that my client never traded a single stock in his

24   life.  Certainly during the entirety of this conspiracy he did

25   not trade any stocks.  I know that on the wiretaps, and I have

18J6GULS

1    reviewed the transcripts, he is heard talking about making

2    millions and making enough money to retire, but I think that is

3    part and parcel of his mental condition.  I believe that that

4    is evidence of his mania and grandiosity and Dr. Kirwin who has

5    written an extensive psychological summary can speak in greater

6    details about that.

7          I also want the Court to know that I personally

8    participated with my client at two lengthy proffer sessions at

9    the United States Attorney's Office.  Mr. Tarlowe was present

10   for both of those sessions as well as Mr. Fish and agents of

11   the FBI.  During those sessions, my client did everything he

12   could possibly do to assist the government in getting

13   convictions with respect to those who were going to trial.

14         THE COURT:  That was when?

15         MR. SOSHNICK:  I don't have the exact dates.  Perhaps

16   Mr. Tarlowe has the exact dates.

17         THE COURT:  Well, are they before or after Mr.

18   Goldfarb's guilty plea?

19         MR. SOSHNICK:  They were before his guilty plea, your

20   Honor.

21         MR. TARLOWE:  Your Honor, the proffers were

22   approximately a month or six weeks before the trial and

23   probably a week or two before Mr. Goldfarb's guilty plea.

24         THE COURT:  Relatively late in the date, right,

25   Mr. Soshnick?

18J6GULS

1          MR. SOSHNICK:  Your Honor, I want to be clear, I came

2     into this --

3          THE COURT:  I am not faulting you or anyone.  I am

4     just asking about the timing.

5          MR. SOSHNICK:  I understand, your Honor.  I came into

6     this case late in the day and the prior attorney was told by

7     Mr. Goldfarb that Mr. Goldfarb's desire was to cooperate with

8     the government, and I wasn't present for a prior proffer

9     session.  But Mr. Goldfarb tells me that he did present himself

10    and he spoke with an FBI agent and assistant United States

11    attorney Reed Brodsky well before I came into this case.

12          So the two proffer sessions where I personally

13    attended and participated were as Mr. Tarlowe said about six

14    weeks before the trial and a few weeks before my client entered

15    his guilty plea but shortly after his arrest when he retained

16    counsel in this case.  It is my understanding that he

17    immediately told his prior counsel that he wanted to cooperate,

18    accept responsibility, make amends for the wrongs he had done

19    in this case and that he did in fact attend a proffer session

20    with Mr. Hoffman and assistant United States Attorney Reed

21    Brodsky is a and an FBI agent.

22          So I don't want the Court to think that this was an

23    idea that came late to my client.  This was his initial

24    reaction to the situation.  His initial reaction was to join

25    Team U.S.A. right away.  The government I think felt that they

18J6GULS

1    had sufficient proof against Zvi Goffer and his brother and

2    they were not necessarily interested in allowing him to

3    cooperate.  When I entered the case, I implored Mr. Fish and

4    Mr. Tarlowe to allow my client to proffer because I believed

5    that my client was uniquely qualified to cooperate in the sense

6    that he had dealt with the attorneys at Ropes & Gray as well as

7    Zvi Goffer and Zvi Goffer's brother Emanuel, where the

8    cooperator Bryan St. Arlas had only dealt with another attorney

9    at Ropes & Gray, Mr. Arthur Cutillo, and my client.  I said my

10   client can close the loop and explain to you what was happening

11   with respect to Zvi Goffer and Emanuel Goffer, and also I

12   indicated that he had in his possession an exhibit that was

13   handwritten by Zvi Goffer that I thought might be important for

14   the government to see and possibly utilize in its prosecution

15   against the Goffer brothers.

16         Further, I indicated that my client had a safety

17   deposit box and that there were certain records that were

18   associated with that box that figure in this conspiracy that

19   may be useful to the government in establishing guilt beyond a

20   reasonable doubt.  So the government agreed to allow these

21   proffer sessions to go forward.  And also during these proffer

22   sessions my client answered particular questions that were put

23   to him by the government prosecutors and the FBI agents who

24   were present with respect to certain nuances of the conspiracy

25   and I honestly believe that he provided assistance.  He was

18J6GULS

1   willing to testify but the government decided not to have him

2   testify.  Even during the course of the trial, I indicated that

3   if the government wanted my client to testify as a rebuttal

4   witness if the government believed that to be necessary and

5   appropriate, my client would make himself available on a

6   telephone call.

7         So I want to be clear my client's initial instinct was

8   to cooperate and accept responsibility when he was arrested and

9   he discussed that with prior counsel and there was an early

10  proffer session.  When I was hired my whole focus was on having

11  my client cooperate and he did.  I understand that the

12  government has decided not to give a 5K letter in this case and

13  I respect the government's decision.  However, I believe that

14  pursuant to the Second Circuit holding in *United States v.*

15  *Fernandez*, the Court should take into consideration the fact

16  that my client cooperated and did provide tangible assistance

17  to the government in obtaining convictions in this case.

18        Further, I want the Court to know that my client's SEC

19  counsel is present here in the courtroom and I did attach a

20  letter from him to my submission.

21        THE COURT:  Yes.

22        MR. SOSHNICK:  My client is continuing to cooperate

23  with that federal agency.  So I think that the *Fernandez* case

24  absolutely entitles the Court to credit my client for the

25  cooperation both with the U.S. Attorney's Office and his

18J6GULS

1     ongoing cooperation with the Securities and Exchange

2     Commission.

3              Of course my final point is that based upon my

4     client's mental condition, the Court is absolutely entitled to

5     sentence my client below the guideline range.  There is a very

6     detailed psychological summary that was attached to my

7     submission.  I indicated in my submission that if the

8     government wanted to challenge any portion of the psychological

9     summary, we would like to have a hearing.  Dr. Kirwin is

10    present.  I have discussed that with Mr. Tarlowe and he

11    indicated he is not challenging any portion of the

12    psychological summary and a hearing would not be necessary from

13    his perspective.  But if the Court wants sworn testimony, Dr.

14    Kirwin is available for that purpose.  If not Dr. Kirwin wants

15    to speak at these proceedings and share her thoughts and her

16    analysis with respect to Mr. Goldfarb and where he stands at

17    the present time.

18             THE COURT:  I don't think we need a hearing.

19             MR. SOSHNICK:  Very well.  So for all the reasons set

20    forth in my submission, I don't believe a sentence of

21    incarceration is necessary.  I know that my client has learned

22    a very, very dear lesson.  I know that he has suffered greatly

23    as a result of the mistakes that he made which, resulted in his

24    involvement in this conspiracy.  Most particularly he is no

25    longer going to be a lawyer, a counselor, an attorney at law.

1    This is something that he absolutely loved.  This is something
2    that defined him professionally.  This is a huge loss to him
3    and I know that we all know lawyers who don't like being
4    lawyers who regret ever having gone to law school.  This is not
5    one of those people.  Mr. Goldfarb is somebody who loved
6    practicing law for from the very first day and I know that
7    there is a whole hole in his heart as a result of the fact that
8    this disbarment is imminent.  And of course the embarrassment
9    that he has caused himself, family, friends and colleagues is
10   something that he feels every single day.
11        So as my client has indicated in his letter to you,
12   your Honor, he has already been punished more severely than
13   anyone can possibly punish him with respect to imposing a
14   formal sentence.  I recognize that your considerations is
15   general deterrence, and this is something that concerns me
16   greatly because I know you have to take that into
17   consideration.  All I can say to you is that my client is
18   absolutely agreeable to disgorging the $32,500 that he received
19   as his share of the proceeds of this conspiracy.
20        Frankly, your Honor, if he were punished based upon
21   the offense he committed and not held accountable for the
22   profits of the Goffer brothers, we would be looking at a
23   guideline range that would afford the Court the opportunity to
24   give Probation, he would be in Zone A in this case considering
25   the fact that my client has no prior criminal history.  But I

1    recognize that we entered into a plea agreement that knowledges

2    those 16 additional points and the profits of the Goffer

3    brothers.  But I think in fairness when the Court fashions a

4    sentence in this case, it should recognize that the only money

5    my client received was the $32,500 and all of it went to help

6    his parents, and in particular his mother who unfortunately got

7    the bad news of the cancer diagnosis.

8              There are many people who would like to speak and who

9    know Mr. Goldfarb a lot longer than I know him and whenever the

10   Court is ready to hear from them, I can tell you who is present

11   be who wants to come forward.

12             THE COURT:  All right.  Why don't we do that now.

13   Unless, Mr. Tarlowe, you want to respond to the certain points.

14   It doesn't have to be now.

15             MR. TARLOWE:  It doesn't have to be now.

16             THE COURT:  You will get an opportunity.  I don't know

17   if it makes sense for you to hear from everyone and then

18   respond now or respond now to Mr. Soshnick and then respond

19   after others have spoken.

20             MR. TARLOWE:  I will be happy to do it once after they

21   have spoken.

22             THE COURT:  My practice generally, and I will tell

23   everyone is not unique but I think it is somewhat usual, I

24   typically do allow family members to address the Court.  Most

25   sentences that doesn't happen, but I think a sentence imposed

18J6GULS

1   on one individual has affects on a great group of people and no

2   one more significantly than family members who I think can very

3   seriously be considered victims of the crime.  I think it is

4   important to give them an opportunity to be heard.  I don't

5   necessarily encourage them to do it because public speaking is

6   difficult.  Speaking in the courtroom is difficult.  It can

7   sometimes be a hard thing.  I leave that up to the discretion

8   of the individual friends and family members.

9          I read the letters.  Sometimes people are more

10  comfortable expressing themselves that way.  No one should feel

11  the need to stand up and speak out of fear I haven't read what

12  is in the letters because I can assure you I have read those

13  letters more than once.  I thank you for taking the time to

14  write them.

15         MR. SOSHNICK:  In light of your comments, your Honor,

16  I would like to first call upon my client's mother Nancy

17  Goldfarb to address the Court.

18         THE COURT:  Ms. Goldfarb, as I said before it is a

19  difficult thing even for lawyers to speak in court.  Take your

20  time.  Your name is Nancy Goldfarb, the usual spelling.  You

21  don't have to spell your name for the record.  Some of the

22  other speakers may have to do that.  Speak clearly and take

23  your time.

24         NANCY GOLDFARB:  I don't want to disappoint my son.  I

25  don't want to be standing, like you said it very difficult but

1    I can disappoint him.  You read my letter.  I am his mother.  I

2    mean what mother is not going to stand here and tell you how

3    great their child is and he is.  I wish you knew him under

4    different circumstances.  I didn't plan this talk.

5              THE COURT:  Speaking from the heart.  I understand.

6              NANCY GOLDFARB:  I don't cry.  So if I do this is

7    going to be a first.

8              THE COURT:  I do sometimes.

9              NANCY GOLDFARB:  I don't.  I am a rock.  My son has

10   been a great kid his entire life.  I have gotten two phone

11   calls in his life, November 5th from Robin that the FBI had

12   arrested him.  He is a very big practical joker.  I thought it

13   was a crazy joke.  The other call I will tell you a little bit

14   later.

15             Too much has been put on my son.  I am always the one

16   who handled everything.  My husband and I were high school

17   sweethearts, but when I was diagnosed he became useless.  My

18   son was a law school getting ready to do the bar, finals,

19   whatever it was.  He was the one that took me to surgeries,

20   took me to treatment.  Too much was put on him.

21             Forget this conspiracy.  For me personally the biggest

22   conspiracy was my husband went to my son behind my back and

23   asked for help with health insurance.

24             THE COURT:  That is in 2007?

25             NANCY GOLDFARB:  I am confused with the dates today.

18J6GULS

1    I've always told my kids if anyone tells don't say something to

2    your mother, red flag should go up.  I didn't say that includes

3    your father.  He still to this day is covering my health

4    insurance with all this stuff going on.

5         The second phone call.  The first phone call ever, I

6    said there were two phone calls, about Jason ever did wrong.

7    He was in junior high.  I get a call.  I was in business with

8    my husband.  I get a call from the dean thinking it must be

9    some kind of award, that is the only thing you ever hear with

10   Jason, and he says to me, Ms. Goldfarb, I have a little boy

11   sitting in any office with these blue eyes like oceans crying.

12   He said, We had an incident in the lunch room.  Incident in the

13   lunch room?  He says, Yeah, he was throwing spit balls.  I

14   said, What?  So I pick him up from school and he gets in the

15   car and the tears are flying.  Ma, I have to ask you something.

16   What do you back my lunch in?  I said a bag.  He said what do

17   you put the sandwich in.  Zip-lock bags.  He said, Ma, it was

18   tinfoil.  It was tinfoil.  Girls were flirting with me.  They

19   started it.  He was the lawyer then.

20        Other than that I never had anything with Jason other

21   than awards, honors.  This never should have been.  I don't

22   know what else I am supposed to say.  I want to say the magic

23   words.  I am his mother.  I am supposed to be there to fix

24   everything and I can't fix this.  It is left in your hands.

25        You know, he was a bad boy at two.  He was a biter.

18J6GULS

1    He used to bite kids.  So we started his first day of the

2    toddler program, drop him off.  It is only going to be for two

3    hours.  I come back and Ms. Lynn says to me, Nancy, we had a

4    little problem.  Problem, what did he do?  He bit this kid.

5    She said, What have you tried?  I said, I tried everything.  I

6    spoken to the pediatrician.  I put salt on his tongue.  Any

7    idea anybody ever told me, I tried.  She said, This is what

8    we're going to do.  Tomorrow I want you to bring a little brown

9    paper bag and have a bunch of treats in there and we're going

10   to do the reward system.  Every day he goes through a day that

11   he doesn't bite anyone, he will get to pick something out of

12   the bag.  10 cent toys.  He never bit again.  Jason does well

13   with not hash sentences and punishment but rewards.  Try in

14   your heart, please, to be lenient.  I don't know what else to

15   say.

16           Jason, I hope I did okay.

17           THE COURT:  Thank you, Ms. Goldfarb.

18           MR. SOSHNICK:  Thank you, Ms. Goldfarb.

19           Your Honor, the next thing who would like to speak is

20   my client's fiancee, Robin Kowlaski.  Ms. Goldfarb referenced

21   her.

22           THE COURT:  Yes.  I will ask you to spell your name

23   first and last.

24           ROBIN KOWALSKI:  I am Polish so I hope I can do.  I

25   have to make a joke.  K-o-w-a-l-s-k-i, R-o-b-i-n.  I am Jason's

18J6GULS

1    fiancée.  I am an oncology chemotherapy nurse.  I am here to
2    stand before you obviously to beg for leniency for Jason, but
3    for me too.  Prior to Jason's arrest, which will be about two
4    years ago almost, we were actively planning getting married and
5    starting a family and obviously that has been put on hold.
6    What I fear the most, what keeps me awake every night is not a
7    lot of people know, only close family and friends, my early 20s
8    I was diagnosed with a cardiac arhythmia and I went to several
9    specialists and they had recommended that I have children.
10   Don't wait until I am 30 to have start a family.  It was
11   advised strongly against waiting until after 35 and as of this
12   past April I am now 30.  So I fear if you are not lenient that
13   it would be a live sentence for me if I am unable to have
14   children because the real tragedy would be that Jason will be
15   an excellent father, but I would be the best mother.  So I just
16   beg for leniency for him and for me.  Thank you.  I am sorry.
17            THE COURT:  That's all right.  That's fine.  Thank
18   you.
19            MR. SOSHNICK:  Your Honor, the defendant's father
20   Marcel Goldfarb will like to address the Court.
21            MARCEL GOLDFARB:  M-a-r-c-e-l.  Good morning.  I am
22   Marcel Goldfarb, Jason's father.  What can I say?  We have a
23   small family, but now I look around and I see a big family.
24   Jason is a good guy.  So I see people here that must think the
25   same way as we do.  I feel the burden I put on Jason is my

18J6GULS

1    fault.

2          You know, you take a person who walks into a grocery

3    store and you see there is a piece of bread and he only catches

4    him, calls the police and arrests him.   There is another guy

5    who robs the truck full of groceries.   That guy is greedy.

6    Jason or that person was hungry to help a person, and the store

7    owner who caught that person should have a heart.   He didn't

8    steal because of greed.   He stole because he was hungry.   There

9    is a difference between greed and necessity.

10          When my wife was diagnosed with cancer, I fell apart.

11    Everything fell apart.   So I feel I put a big burden on Jason.

12    From the people I see here, he has heart.   He must have touched

13    these people's hearts like he always touched ours.   If there

14    was a way for me to take his place, I would do it right now.

15          THE COURT:   I know you said that in your letter, but

16    unfortuneately that is not possible as you know.

17          MARCEL GOLDFARB:   Exactly.   I wanted to let you know

18    again in case you missed that, which I know you are very

19    thorough.

20          I want my Jason back.   I put him in another world and

21    I feel most of it like I said is my fault and all these people

22    here know the person my son is.   We can't take it anymore.   I

23    want my son Jason that everybody knows.   And incarceration I

24    don't know what it would do to him.   I know what it is doing to

25    us as of now since all of this started.   I want our Jason back.

18J6GULS

1    He fell off a little bit and it is my fault.  No one else's

2    fault.

3            THE COURT:  Why do you say it is your fault and no one

4    else's fault?

5            MARCEL GOLDFARB:  The burden.  Because we always -- we

6    taught our kids to protect your family and I think he just went

7    off a little bit.  He couldn't see us suffer.  Jason doesn't

8    want to see anybody suffer.  He is the go-to guy, Jason.  I

9    think the world needs a person like Jason because he is a good

10   guy.  You can see from all the people here.  He must have

11   touched their hearts.  So he went off the truck just like that

12   guy who went in and stole the salami and bread.  He wanted to

13   survive.  It wasn't out of greed.

14           So if the Court could show some leniency, it would be

15   the best thing in the world you could do because we try to grow

16   up our kids for the world and to be kind and gentle and be a

17   good person.  So if the Court, I would appreciate if the Court

18   shows some leniency because incarceration with this gentleman,

19   I am just scared that he is not going to come back as the Jason

20   as we all know.  Thank you very much for listening to me.

21           THE COURT:  Thank you.  This is difficulty.  It is

22   difficult and hard on families.  That is one of the unfortunate

23   realities with sentences.  There are innocent people affected

24   and certainly I am mindful of that.  It is heartbreaking to

25   think about.

18J6GULS

1          MR. SOSHNICK:  Thank you, your Honor.  There are some

2     clients of Jason who would like to address the Court.  The

3     first one is Kathy Capalvo.

4          KATHY CAPALVO:  Good morning, your Honor.

5          THE COURT:  Let he ask you to spell your name.  I read

6     your letter, which was very moving.

7          KATHY CAPALVO:  Kathy, K-a-t-h-y, Capalvo,

8     C-a-p-a-l-v-o.  Jason is my lawyer.  He has been my lawyer for

9     a couple of years, three years 11 months and six days.  I lost

10     my husband lymphoma.  This was caused by exposure.  No one

11     wanted to help me.  I have two sons and I had nothing.  He was

12     our superman, our rock.  We had nothing.  I had no hope.  I had

13     no way of getting restitution or supporting myself at the time

14     as a part-time teacher's aide and then Jason stepped up.  He

15     became my lawyer.

16          He answered every question and I called him

17     constantly -- constantly -- for everything.  I didn't know what

18     I was doing.  I didn't know at that time that his mom was going

19     through cancer also.  So what I was putting on him, I can't

20     imagine on top of what he was going through with his mom.  He

21     stuck with me and my son and he taught me.  He answered every

22     question.  He was diligent, patient.  He was kind to me.  He

23     saw how he cared for my sons and he said, You are like my mom.

24     My mom will do anything for me.  Now I see.  Oh, my gosh.

25          He is a wonderful lawyer.  He is my friend.  Now I

18J6GULS

1    just cannot say enough about Jason.  I will say anything that

2    will help him.  I would be grateful to you.  I would do

3    anything for my sons.  And what he did for his mom, he did for

4    his mom.  Thank you.

5              THE COURT:  Thank you very much.

6              MR. SOSHNICK:  Your Honor, Linda Pryor is another

7    client of Jason's who would like to address the Court.

8              LINDA PRYOR:  Good morning, your Honor.

9              THE COURT:  Just state your name and spell your name

10   for the record.

11             LINDA PRYOR:  Linda Pryor, L-i-n-d-a, P-r-y-o-r.

12   First, I have to say I was not -- I asked to be here today and

13   I want to hold this together because after seeing his family

14   speak and I know the pain they are going through, I almost feel

15   like I don't have a right to be emotional.  But I have been

16   emotional about this ever since I heard about it.  Jason is

17   also my lawyer.  Jason literally saved my life.  When Jason

18   came into my life, I was about to be evicted.  I had no money.

19   I had been injured on the job and I was not getting paid.  I

20   was in total despair and then I met Jason.  He is such a good

21   person.  He fought for me.  He answered every question I had.

22   I don't care when I called Jason, he always had time for me.

23   He offered any help that he could.

24             Sometimes people make mistakes and I know that it is

25   so out of character, but when you are under stress, you are

18J6GULS

1   likely to do anything especially when you have the history, the

2   health history that his mother had.  I know because my sister

3   had cancer and I was willing to do anything to help her.

4            I am hoping that the Court will take into

5   consideration how many people he has helped and know that

6   nothing he did was not for profit for him.  Jason is such a

7   good person and he is my friend and there is no place else I

8   would have been today except here to show support to someone

9   who has done so much for me and I am really praying that the

10  Court will take that into consideration.  He really deserves a

11  chance.  Thank you, your Honor.

12           THE COURT:  Thank you.  I appreciate your taking the

13  time.

14           MR. SOSHNICK:  With the Court's permission Luis

15  Crisafi, who was another client of Jason's.

16           LOUIS CRISAFI:  Good morning, your Honor.

17           THE COURT:  Spell your name.

18           LOUIS CRISAFI:  Louis, C-r-i-s-a-f-i, L-o-u-i-s.

19           If I may, your Honor, I just if you don't mind will

20  give you a quick background.  First I would like to address the

21  Court and say thank you for allowing me to address you.  I

22  would just like to say that my background is that I am a

23  retired police officer, 25 years service and was injured on the

24  job.  Jason was my attorney.  I don't know Jason really

25  personally.  My brother who is also an retired New York City

1   detective was good friends of his when they were younger, very

2   good friends with the family.  I came into contact with Jason a

3   few years ago as a result of my injury.  The only thing I can

4   say about Jason is the guy is as solid as can be.

5          I have been a narcotics officer for over 25 years.

6   Your Honor and I both know that every defendant gets in front

7   of a court and they are sorry they got caught.  That is what

8   they are really sorry about.  In this case, this is a man who

9   is going to be sentenced for the rest of his life.  What he did

10  he is taking responsibility for.  He did that by a plea

11  bargain.  He stepped up to the plate.  What he is going to face

12  now from this court and what he is going to face from his peers

13  and all his friends and family and everything in his future, he

14  will live with for the rest of his life.

15         I know from my background I know good people and I

16  know when people need another chance.  This is a say man, your

17  Honor, that I beg the Court to give another chance to.  I had

18  the pleasure of learning who this man was in the last several

19  years as a result of my injury.  I wound up with some very

20  severe psychological problems.  He wasn't an attorney, he was a

21  friend.  He stepped up to the plate when other people turned

22  their back.  I cannot forget that.  I just had epidural

23  injections and I am not supposed be out of bed and I took the

24  train in from Hoboken to get here.  I would never do that and I

25  would never take this Court's time if I didn't feel that it was

18J6GULS

1   so important to let this Court know the kind of person that you

2   have sitting in front of you.

3        I realize there are sentencing guidelines and there

4   are situations that somebody needs to pay for the type of

5   offense that they did.  I implore this Court to take a very

6   good, deep and hard look at the defendant in front of you and

7   to be as lenient as possible.  Personally I am incredibly

8   impressed when I look around and an attorney has this many

9   people that are in back of them.  I want to thank your Honor

10  for your time.  I want to thank Jason for the friendship, the

11  professionalism that he has provided me and I hope that justice

12  is served today the best that your Honor sees fit.

13           THE COURT:  Thank you.

14           MR. SOSHNICK:  With the Court's permission, I would

15  like to call upon one more client, Mava Hart.

16           THE COURT:  Spell your name so the court reporter gets

17  the correct spelling.

18           MAVA HART:  M-a-v-a, H-a-r-t.  First of all, I would

19  like to -- I want to say so Jason's parents I want to thank you

20  for the man that you created because Jason came into my life at

21  a point where I felt the attorneys I had in my life weren't

22  doing anything for me.  I walked into Jason's office and he

23  spoke to me.  There was something in the way he said what he

24  said that made me feel as though I had the best person in my

25  life right in front of me.  I had lost my baby sister to breast

cancer, the sister right behind me use three time survivor, and
I was sitting in his life fearing for my own life because I
thought I had breast cancer.  Jason said to me, Don't worry
about it.  He said, I am going to take care of you.  He said, I
know someone that can help you and this is what you need, I am
here for you.  Whenever I called Jason about anything, Jason
would always say, Don't worry about it, I will take care of it.
I want to let you know, Jason took care of everything and he
kept his word.  He is a man of his word.

Your Honor, we all make mistakes.  There is not a
person in here that has made a bad decision, but we need Jason
because he is passionate about the job that he does.  He loves
people.  He loves the fact that he can help people and I've --
everywhere I go when I find out someone needs a lawyer like
Jason, I give his name and number and his cell number.  He will
tell you, Call me.  I don't care what it is.  I was lying in my
bed and in a hospital.  I had just had emergency surgery.  I
said, Oh God, I have to call Jason and let him know what is
going on.  He said, Look, aside from the case if there is
anything that you need, let me know.  It doesn't have to be
pertaining to the case.  Just let me know and I will take care
of it.  I know that he would do it and I appreciate the fact
that he extended himself because in this day and time we don't
have people who care.

I worked for New York City Transit Authority for 21

18J6GULS

1    years and I never seen anybody who had that kind of heart, that

2    kind of passion because we're in a world that people care about

3    themselves and themselves only.   Jason cares about people.

4    People matter to Jason.   We need Jason because he cares about

5    people.   We've got to the point where everything is everybody

6    taking care of themselves and get what they want out of the

7    situation.   Yes, he will get paid for the work that he does,

8    but he will never be paid for what he is really truly worth.

9    Himself the way he puts himself on the line for people, he can

10   never be paid for that.

11          The very fact that he is facing this situation, my

12   heart is heavy because I know in his heart that he would never

13   have made this decision if it had not been for the stress that

14   he was put on.   Family is family.   You will make the sacrifices

15   for your family.   You will do whatever you need to do for your

16   family.   At that time this is a young man that is trying his

17   best to hold his own, do what he need to do for himself as well

18   as his parents.   We live in a world today where kids don't even

19   care about their parents.   People don't care about one another,

20   but he cares about his parents and put himself on the line and

21   he knew he had to step up on the plate.   I know what that is

22   like when you have to be the person who has to stand up and be

23   there for everybody else and put yourself on the back burner.

24   So he made a decision based on the fact that I have to do what

25   I have to do for my parents.   There was no thought in his mind

1    that, Wait a minute, I have think about my parents, my parents

2    need me.  Jason doesn't know this but I grew to love him

3    because of the fact that he touched my heart.

4         Everyone I turned to and gave his number they called

5    me back and they said, Mava, this is amazing, this man is

6    awesome.  Everyone told me Mava, I am so glad you told me about

7    him.  Jason will answer ever call.  He doesn't care what time.

8    He tells you, I am sorry for calling so late, but he will

9    answer.  We need people today because people are not -- they

10   are not -- they don't care about one another and Jason cares.

11        If I could please, your Honor, please, I know that you

12   have your sentencing guidelines, if nobody else needs him, I

13   need him because there are times when I cannot make a decision

14   for myself.  I was at a point where I didn't even know how to

15   write a letter and Jason said, Look, I will handle it for you

16   and I thought about what he is going through and I felt like

17   Mava, You cannot put that on Jason.  Let him deal with the

18   situation.  He is dear to me and I kept thinking all this time

19   there was something I could do for him.

20        When it came to the point of being here, I got up this

21   morning with pain through my body and I prayed and I asked God,

22   please give me the strength to be here because this man needs

23   for people to know who he is and if there is something that I

24   can say to you that would make it a little better that you

25   would decide on his behalf to, you know, be lenient, please be

18J6GULS

1    lenient because there are not people out there with that kind

2    of passion.  This man is passionate.  I cannot tell you about

3    that.  Here, I am a black woman and you know he could call me,

4    look, if I can do something for him, I would do it for him in a

5    heartbeat.

6              I wanted him to know that you are special to me.  You

7    will always be special to me because he stood up for me when my

8    family wasn't even there for me.  That means a lot to me and I

9    want to thank you.

10             THE COURT:  Thank you.

11             MR. SOSHNICK:  Your Honor, as you can see there are

12   many friends and family of my client who are here.  Some of

13   them would like to speak and I would like to beginning with

14   Michael Barrows.

15             MICHAEL BARROWS:  Good morning, your Honor.  My name

16   is Mike B-a-r-r-o-w-s.  I am an attorney in New York.  I went

17   to law school with Jason.  Throughout law school he helped me a

18   lot.  There have been some hard times and easy times.  Jay has

19   always had a love for the law and people.  The second I met him

20   we hit it off and became great friends.  He is a wonderful

21   person.  There is a common thread between all these people who

22   came up here.  It shows that Jason is a very unique individual.

23   He may have done something wrong.

24             THE COURT:  No, he did something wrong.

25             MICHAEL BARROWS:  He did something wrong.  Judge, I

18J6GULS

1    apologize.  He took responsibility for it, Judge.  It is, I

2    just don't know what to say.  I know Jay is a person very

3    inclusive when it comes to his feeling.  I wish he had told me

4    about his problem with his family.  I know Robin.  I introduced

5    him to his fiancée.  I have been to his parents' house.  I know

6    his brother.

7             Regretably my mother could not be here today who knows

8    Jay.  She couldn't handle the fact that this was happening.  My

9    grandmother had pictures of Jason with my grandmother who was

10   in South Carolina during the time that he was -- during the

11   time of our graduation.

12            Soon after our graduation, I moved to Jay's block.  I

13   would get up and my job wasn't as demanding as his at first.  I

14   would see Jay go in 7:00 in the morning.  I would come home,

15   maybe I would get food.  I would see jay come home 9:00 or

16   10:00.  He loved what he did.  He loved being a lawyer and

17   helping people.  I think that everyone has attested to that

18   already today, Judge.  I think you received a lot of letters

19   attesting to that fact.

20            What happened happened.  I know he regrets it.  He

21   used to have dark hair like me two years ago and now it is

22   gray.  He is a good man, Judge.  I pray that the Court will

23   show leniency and mercy for him.  It was done out of necessity

24   and it was --

25            THE COURT:  Why do you say that?  Everyone keeps

1  saying it was done out of necessity.  It was insider trading.

2  It is not a momentary lapse, right?

3         Are you familiar with the facts?

4         MICHAEL BARROWS:  I followed it since day one, Judge.

5  I don't want to go -- I don't know -- I don't want to comment

6  on that, Judge.  There was a plea.  I don't want to.  I know he

7  is regretful for what he did.  He suffered emotionally,

8  physically.  He is losing his license.  He suffered greatly in

9  this and I would just ask, Judge, that the Court please show

10 some leniency, mercy.  He is a good man.  He is a man who wants

11 to start another life with his fiancée.  This is a man who was

12 punished enough I believe, Judge.  I want to thank you for your

13 time.

14        THE COURT:  Thank you.

15        MR. SOSHNICK:  John Merlino.

16        JOHN MERLILNO:  Judge, I would like to start off --

17        THE COURT:  Start off by stating your name and

18 spelling it.

19        JOHN MERLILNO:  M-e-r-l-i-n-o.

20        THE COURT:  John.

21        JOHN MERLILNO:  Yes.  I would like to thank you, your

22 Honor, for allowing us to speak today.  You heard family speak

23 on behalf of Jason as to his character and as a beautiful human

24 being.  I am like you, I cry, Judge.  Jason has touched my

25 heart.  I have had the honor to meet him and work with him at

18J6GULS

1     the old law firm in 2002.  We all have a family member or a

2     friend who is the life of the party, Jason was the life and

3     sole of that firm.  He would continually and constantly offer

4     his help to fellow colleagues.

5              I had a moment in my life that I articulated in my

6     letter where I too went through a hardship with my dad and I

7     know many people, your Honor, but Jason came forward and I

8     never forgot it.  He offered so much help to watch our children

9     so I could be with my dad, transport my mother to the hospital.

10    No one offered that.  I had a large family.  No one came

11    forward except Jason.

12             I noticed through the years as we worked together, and

13    it is coming to fruition based on what I heard, the plea,

14    everything that happened here, that in '07 Jason seemed to have

15    his spirit smoothed.  No one really understood why.  Jason was

16    close to many colleagues in the old firm.  At times we would go

17    out with other colleagues, he would drink a lot.  It was out of

18    character for Jason to do something like.  He was the person

19    who would initiate basketball games with other colleagues.  He

20    was very active in playing sports such as hockey.  So when all

21    this happened and I was active in Brooklyn working for some

22    politicians at the time, there was rumors about a store in

23    Sheepshead Bay called Sea Horse.  That is my colleague's dad's

24    store.  It was rumored that he was having financial difficulty.

25             Moving forward as time went on Jason started e-mailing

1    the partners in the firm, other associates, if he could start

2    working harder and participating in municipal pension

3    department or social security department to earn more money.

4    He came forward and he tried and he tried to seek help, but the

5    problem with Jason he had pride and it is evident today based

6    on the way everyone is speaking and the way his father

7    articulated it as well. It is very hard to see a man like him

8    sitting here today and going through the punishment that he is

9    going through by losing his license. I know Jason. This is

10   killing him that he has to sit here before his mother and his

11   father and his fiancée. This is torture enough for this man.

12   He has touched some people's lives. It is unfortunate. He has

13   clients that are here at the old firm you can pack this room

14   with probably 100 clients that Jason worked with and helped.

15          There was one particular client who was a priest, who

16   was Father Mike, Father Champion. Jason was the one would was

17   assigned to his case. What this man did, and I don't know if

18   your Honor is familiar with worker's comp, workers'

19   compensation take years to establish a thumb. This individual

20   Father Champion was at Ground Zero, conducted last rites for

21   the heros that had perished during that tragic event. It was

22   unfortunate for the priest he developed lung diseases and

23   whatnot. Jason was there. He helped him. He helped him

24   obtain the medical treatment he needed. He helped Father

25   Champion get his benefits. If I had access to our old firm's

18J6GULS

1    clientele list, you would see literally hundreds of people

2    here, your Honor, on behalf of Jason.   This is who he is.

3          Your Honor articulated that it is a crime that

4    affected other people and I think it is evident that a lot of

5    people depend on him and need him.   I have three older sisters

6    and I know it is tragic for me, but I had the honor of being

7    friends with Jason and he has truly been like a brother to me

8    and the things that he has done especially when I was going

9    through this hard time with my dad, I can never ever forget the

10   unselfishness that he portrayed to me to help me and my family

11   and I will never forget it.

12         I beg you of, your Honor, that you show mercy on him

13   and truly believe in your heart that this is an individual that

14   made a mistake and his lack of judgment wasn't his fault.   He

15   was under a tremendous amount of stress.   It was evident

16   working with him and seeing the change in Jason to life of the

17   party to an individual who was to himself, very pensive.   It

18   makes sense now.   So I beg of you, your Honor, please show him

19   mercy to this man.   He is a good man.   He is a good person.   By

20   showing your leniency, you are really trying -- you are truly

21   in my eyes and the eyes of everyone who is here for him that is

22   justice.

23         THE COURT:   You don't understand or you don't seem to

24   there are other people who are not here who will be looking at

25   this sentence.   This sentence matters to others who don't know

18J6GULS

1    Mr. Goldfarb personally, but it is an important sentence to

2    them as well.  You are a lawyer so you understand that.

3         JOHN MERLILNO:  I understand as you indicated the

4    guidelines.

5         THE COURT:  Not just guidelines.  There are other

6    objectives of sentencing that are important.  If lawyers get to

7    commit crimes and able to say, Well, I am going to lose my

8    license and that is punishment, what message does that send to

9    a broader population?

10        JOHN MERLILNO:  I can't speak for other individuals,

11   your Honor.  I can only speak for Mr. Goldfarb and knowing him

12   as a friend and as an individual as a human being that is why I

13   am here speaking --

14        THE COURT:  I understand that.

15        JOHN MERLILNO:  -- not conducting summations or

16   arguing a case.

17        THE COURT:  I am asking you to consider some of these

18   other objectives.  These are the objectives that Congress has

19   directed be considered.  As a lawyer, I think you more than

20   some of the others who have spoken, might understand some of

21   those, might consider them.

22        JOHN MERLILNO:  I may or may not.  I do worker's comp.

23   I appreciate your time.

24        THE COURT:  I appreciate your being here.  I

25   understand you are speaking about what you know.  You are

18J6GULS

 1    speaking about a person that you regard as a friend and even

 2    more than a friend, as a brother you said.  That is true of the

 3    others who have spoken and the others who have not spoken but

 4    written letters.

 5         JOHN MERLILNO:  Thank you, your Honor.

 6         MR. SOSHNICK:  Just two more friends and colleagues

 7    and then I will call on Dr. Kirwin to speak.  With the Court's

 8    permission the next speaker will be Jared Levine.

 9         JARED LEVINE:  J-a-r-e-d, L-e-v-i-n-e.

10         Your Honor, I am here speaking on behalf of my

11    partners at Durish, Levine and Morgan.  I am the managing

12    partner of the firm.  We represent about 200 other clients of

13    Jason's who could not be here today but we are the voice for

14    them as well.

15         I met Jason about two years ago after he got arrested.

16    I didn't find out about it until maybe two or three months

17    after that.  I just happened to go online.  I forgot his

18    mailing address.  All of a sudden Jason Goldfarb, insider

19    trader, million dollar claims and I didn't believe it.  It took

20    me weeks to keep going back to look for pictures to see if it

21    was really Jason and I saw that his law firm he worked for at

22    the time was listed, too.  I couldn't believe that it was the

23    person who I knew.

24         As managing partner attorney I have to have good

25    judgment.  People who I bring into my family of business, they

1    have to be honest and trustworthy, compassionate and that is

2    who Jason was to me.  I was shocked.  I couldn't believe that

3    he was that person.  Then he addressed it with me and discussed

4    with me what was going on in his life at that time when he was

5    doing the insider trading.  He told me about Nancy, he told me

6    about her being diagnosed with cancer.  I heard it.  I kind of

7    internalized it.  It could have been an excuse.  I didn't make

8    that much sense to me because that is what I have to do as an

9    attorney, I have to judge people what they did, some are right,

10   some are wrong, some I don't believe, some I do.  Then I just

11   went on thinking Jason was a criminal, that I had bad judgment

12   on who I brought into my family.

13          Then on Easter weekend of this year we got one of

14   those phone calls that my 38-year-old sister was diagnosed with

15   Stage 4 lymphoma and it was everywhere.  I am not a sentimental

16   person.  As my job, I can't be.  I need to be very straight and

17   unemotional, but that shook us to our core.  After a couple

18   weeks of going into work as a zombie and just having to pull

19   off to the side of the road because I couldn't drive because I

20   was losing it, I started thinking about Jason and about what he

21   was going through around the time when I was dismissing what he

22   was telling me about his family.

23          I have a very good moral compass I think.  I think I

24   have very good judgment.  I started thinking what if?  My

25   sister has perfect health insurance.  She is doing well.

18J6GULS

1  Everything is good.  What if she didn't?  What if I had to pay

2  for that and I couldn't would I as an attorney with good

3  judgment as a manager partner do what he did, and before that

4  happened to my sister there is no way.  It never even would

5  have crossed my mind.  I am not a criminal.  But when you look

6  at the total of the circumstances, you know as I am sitting on

7  the side of the road on the Turnpike for those two weeks, I am

8  not the same person who I was.  I am not that person now.

9  Everything is a little bit better and my judgment may have been

10 clouded.  I may have done the things that I wouldn't normally

11 do so that my sister could get chemo or she could have you

12 dignity of having a wig that cost $5,000 that insurance doesn't

13 pay for.

14        So everyone thinks -- they talk about a mental disease

15 that impairs his judgment and I didn't buy that before and I

16 completely do because when you look at the affect that it is

17 going to have on you personally, what he would have been an

18 insider trader if this happened to his mother?  No shot.  I

19 don't think so.  I don't think.  He has good judgment.  The

20 person I know now is not the same person who was trading at the

21 time I fully believe.  I didn't know him when he was trading at

22 the time, but I know him now.

23        Let me speak about punishment.  Losing his license,

24 embarrassment to family and friends.  That is punishment

25 enough.  Obviously he is never going to this.  We talk about

18J6GULS

1   suicide.  What is the message that you are going to send to

2   society if you are lenient?  Society is here today.  You have

3   all the clients, you have the attorneys, firms.  This is

4   society.  I think if there is leniency and not sending him to

5   prison, the message is that there is compassion for people who

6   have a mental disease, who are not themselves when they do

7   something.  Something he may have committed.

8           THE COURT:  No one has said he has a mental disease.

9   We'll hear from the psychologist.  I get a lot of reports and

10   overstate it.

11           Have you read the report?

12           JARED LEVINE:  I haven't read the report, but I spoke

13   to his doctor.

14           THE COURT:  We shouldn't overstate what the facts on

15   the record are at this point.

16           JARED LEVINE:  Absolutely.  My only point is that the

17   person who is sitting here now I don't think is the same person

18   who was committing these crimes and I would ask for leniency on

19   his behalf.

20           THE COURT:  I appreciate your time in writing the

21   letter.  I hope everything is all right with your sister.

22           JARED LEVINE:  Thank you.

23           MR. SOSHNICK:  Your Honor, with your permission Joseph

24   A. Romano, Esq., would like to address the Court.

25           THE COURT:  Yes.

18J6GULS

1          JOSEPH A. ROMANO:  Good morning, your Honor.  Thank

2     you for permitting me to speak.

3          THE COURT:  For the court reporter just so she gets

4     the correct spelling.

5          JOSEPH A. ROMANO:  Romano, Joseph A., R-o-m-a-n-o.

6          I have known Jason for many years now.  I am his

7     employer.  I employed him after his arrest.  Not that I am in

8     the best position to know everything about him, I felt

9     compelled to believe in him and let me tell you why, Judge.  I

10    have been an attorney for 25 years.  That really started when I

11    was about five years old.  I was with my father who is still

12    alive who is going to be 84 next week who was an attorney

13    admitted since 1952.  My father taught me a lot of things.  He

14    taught me about the good and about the bad.  I have seen some

15    bad people, very bad people, Judge.  They wrote books about

16    them.  But I also have had the unique opportunity in seeing

17    things and seeing people that interact on a daily basis --

18    politics, life struggles.  You start to pick up on things.  You

19    pick up on things that are very important to other people.

20          I was in comp court in Yonkers.  That is basically my

21    bailiwick.  I am a Yonkers guy.  My father is from Yonkers.  My

22    brothers are all attorneys and the Romano family is well known

23    in Yonkers.  I was there and I was doing my cases and I saw

24    this almost like a whirlwind come in one day.  I said, Who is

25    this kid?  Who does he think he is walking into my place acting

18J6GULS

1  like this?  He talked to his clients and what I saw was every

2  one of their faces lit up with hope and hope is a very

3  important thing in this life that we live.  I believe that you

4  are very sensitive to that that as long as we instill hope in

5  people that the life that can be very difficult and the trial

6  and tribulations that we do go through makes it a lot easier.

7      And over the years I got to see him and I always said

8  to him, Listen, when you get tired of making money with those

9  big shots in New York why don't you come work with me and

10  really learn how to work.  An opportunity arose, Judge.  With

11  every bad thing, something good can come out of it.  That is

12  what I believe in.  So when he was arrested and I reached out

13  to him and I said, Listen, Jason, I know you have issues,

14  problems.  You come with me, work with me, you come on to my

15  roof.  What we believe, and I told him, I don't care about the

16  money.  I just care about the people.  That is what I was

17  raised to believe in and that is what all the Romanos believe

18  in because that is what my father instilled in us as well as my

19  mother.  We sacrificed for the good of the people.

20      He never missed a day of work.  He worked 100-hour

21  weeks.  He would challenge me and he would call me at 10:00 at

22  night.  Something like my father would do and still does to me,

23  Are you still working?  Are you still working?  And we've had a

24  lot of fun together the last 20 months working and trying to

25  get through this problem of his.

So, Judge, I've tried some cases. I've been in front of your colleagues, but previous to your time there was a Judge Schartzberg up in White Plains. That is where I was in federal court. He was a bankruptcy judge. There was another judge, Charlie Bryant. And those judges from my experience they understood the rules. They knew what they had to do and they also weighed the facts and circumstances of each case. I hear what you are saying, Judge. I listen to the things that you say. I understand your concern as a lawyer and what you are going have to portray out there, what is the general public going to say if you are lenient for this person. He did a bad thing. There is no question about it. I don't understand what he did.

What were you thinking? You were going into a world where these guys, they will eat you alive. They have the hot sauce waiting for you. You had no business being there. It was the wrong place. These guys eat you. They will eat everybody. That is what they do. They just don't understand. Money is their God. They don't understand about family and this. It is about money. You are in the wrong place, wrong time. I don't understand why you would go in that room. You went in that room.

I understand it hurt everybody. I am very angry because I wanted this kid to be with me so we could fight the fight because there are not too many fighters in this world. I

18J6GULS

watch.  I know who is fighting.  Most people just give up.
They quit.  He doesn't quit.  We need these kinds of people
that fight, have that leadership ability.  Now he is going have
to turn a page because obviously he is going to lose his
license.  The qualities that I see in him as a leader, as a
fighter, as someone that instills hope in people, I am not
going to let that go, Judge.

I understand you have to do your job and I understand
what you are going to do, but I am not going to give up on this
kid.  I want you to think about your sentence, and I know you
have already have, your Honor, but I believe in this kid.  I
have not stood up for anybody in 51 years, and I have
represented a lot of criminals back in the day.  I did a lot of
criminal cases so I have an idea about what it is to represent
criminal defendants.  But this kid is special.  One of the
clients says he is special.  He is a special kid.

He shouldn't have been in that dark place.  He should
not have been there.  I am still angry at him.  I am furious at
him that he even ventured into these people's world.  He had no
right being there.  I wish he came to me and said I need the
$32,500 because I would have written him a check and said, That
is your bonus.  You come work for me.  But he don't do that.  I
don't know why.  I cannot explain that.  I understand there has
to be a message conveyed out there because people have to have
it.  I was here for the Cutillo sentence, Judge.

18J6GULS

 1          THE COURT:  You were?

 2          JOSEPH A. ROMANO:  I shed a tear that day because I

 3     saw the pain of his wife who couldn't even speak.  I was there.

 4     But this particular person, Jason Goldfarb, he is a little bit

 5     different.  He shouldn't have been in that room.  These other

 6     guys, that was their world.  They understood.

 7          THE COURT:  Cutillo was recruited by Mr. Goldfarb.

 8     Mr. Goldfarb was his college roommate and targeted him because

 9     he was a source of information.  I don't know if the folks who

10     spoke know about this case.  That is what happened and I

11     reviewed what was done.  I saw what happened.  Cutillo is the

12     not the guy with the hot sauce.  Cutillo is the guy who Mr.

13     Goldfarb targeted because he was a person with access to

14     information that could be used for profit.

15          JOSEPH A. ROMANO:  Judge, I disagree with you in one

16     sense, Judge, Cutillo was in that world.  Jason wasn't in that

17     world.  He was familiar with people in mergers and

18     acquisitions.  He knew these people with Wall Street.  He

19     didn't know about all the big deals.

20          THE COURT:  Cutillo was a patent attorney at a law

21     firm in New York.

22          JOSEPH A. ROMANO:  Yes, Judge, at Ropes & Gray.  I

23     disagree with you.

24          THE COURT:  I think I know a little bit more of the

25     facts than you do.

18J6GULS

1           JOSEPH A. ROMANO:  What I want to end with today,

2  Judge, and what I want to indicate, Judge, those other judges I

3  had mentioned earlier, they understood the rules and they also

4  understood all the facts and all the things that could go into

5  a sentence of this individual.  And one in particular letter

6  was from Father Vincent and he indicated he would hope that you

7  would show compassion.  And with all the things that are in

8  front of you, which is not an easy case, it is a very complex

9  case because you have a psychological report, you have the

10  guidelines, family and friends, there is a way to fashion

11  something that would show a strong enough message to the

12  general public and what you want to accomplish and still show

13  some compassion to this particular individual based on the

14  circumstances, your Honor.  I hope you do that.

15           THE COURT:  Thank you.

16           MR. SOSHNICK:  Your Honor, my client would like to

17  address the Court.

18           THE COURT:  He has a right to and obviously will.  You

19  said you --

20           MR. SOSHNICK:  Dr. Kirwin to address the Court.  That

21  is what we're going to do now.

22           DR. KIRWIN:  Dr. Barbara Kirwin, K-i-r-w-i-n.

23           Your Honor, I stand behind you with a lot of hats

24  today.  You obviously have read my report and I know because I

25  have been before you in the past that you do really take the

18J6GULS

```
1    time to read the psychological reports and I very much
2    appreciate that.  So I am here in my forensic capacity because
3    I truly believed as was indicated in the Probation report that
4    there is an issue of a mental disease or defect that formed a
5    diminished capacity, a damage to Jason's reasoning, to his
6    thinking, to his ability to make decisions, to his ability to
7    control his emotions and impulses.
8              I think you raised a very important point when you
9    mentioned to all of the people who spoke that Jason was acting
10   out of necessity.  Well, one might say that everybody who
11   commits an offense perceives that there is some necessity to
12   that offense.  To me as a forensic psychologist that is not the
13   entire argument because I truly believe that if there was only
14   the necessity of his family as dear and as stressed and as
15   needy as they were, Jason would not be sitting here today.  As
16   far as I am concerned, what tipped it over, what allowed Jason
17   to do something in desperation that was anathema to everything
18   that he was brought up to believe in and everything that he
19   professes was the fact that he is beginning to suffer from what
20   ultimately ends up into a bipolar disorder, which we know is a
21   biological genetically based disorder.  It has been classified
22   now as a biological disorder that cripples lives that in fact
23   crippled his grandmother's life.  So I am not going to go down
24   that path of being the forensic psychologist today.  It is in
25   the report.
```

1           I stand in front of you today as a clinical person who

2    has treated Jason very extensively sense I met him and as a

3    former parole officer who has worked for keeping people

4    rehabilitated in the community.  What I want to say is that

5    extraordinary in this case, aside from the fact that in my 30

6    years I have never saw a courtroom packed like this, is the

7    cooperation and the teamwork and the networking that went on

8    between myself and Jennifer Powers, his pretrial probation

9    officer, and Katrina Minus-Shepherd the probation officer who

10   did the presentencing report.  I believe it was a model of

11   community, dual supervision.  And as a clinician I see that it

12   is the absolute best treat modality to prevent him going down

13   the path of developing this more severe genetic illness.  And

14   the parole officer in me says this is the piece that is going

15   to stop recidivism.  We controlled the mental illness aspect,

16   we're not going to have this kind of behavior anymore.

17           THE COURT:  You think there is a prospect of

18   recidivism?

19           DR. KIRWIN:  I don't think so.  Not in terms of his

20   character.  In terms of what caused this offense, Jason keeps

21   everything very, very closely inside him.  In fact, the reason

22   he came into therapy was because his pretrial probation officer

23   Jennifer Powers noticed there was agitation, depression,

24   irrationality.  In fact, I am sure you've heard the

25   prosecution's wiretap tapes and she also was privy to them,

18J6GULS

1    they are like a textbook for hypomania, which ends of as

2    bipolar disorder.  There is grandiosity, there is excessive use

3    of expletives.  There is --

4           THE COURT:  If that is true then virtually everybody

5    in this case is suffering from the same disorder.

6           DR. KIRWIN:  I was at the Cutillo sentencing.

7           THE COURT:  Did you listen to the tapes?

8           DR. KIRWIN:  Yes.

9           I was at the Cutillo sentencing I read a lot of

10   material in that case and it is just -- it doesn't reach the

11   level of a diagnostic entity.

12          THE COURT:  I am talking about most of tapes that

13   relate to the subject matter that you've been talking to or

14   conversations between Mr. Goldfarb and Mr. Goffer.

15          DR. KIRWIN:  Yes.

16          THE COURT:  Would you suggest Mr. Goffer is suffering

17   from the same disorder?

18          DR. KIRWIN:  No.  Because Mr. Goffer is talking about

19   making money and all this.  And in fact he did, Mr. Goldfarb,

20   is talking about, Wow, I will be rich and I will be set for

21   life.  A point in fact $32,000 that you write every penny of

22   that to your parents does not make you rich for life and set

23   for life.

24          THE COURT:  The plan was not to make $32,000.  If you

25   listen to the tapes, you would know that the plan was to do

18J6GULS

1    this repeatedly.  The plan was to do this on a bigger scale.

2    The plan was to put bigger placements on the trade that

3    couldn't be placed that would yield much larger returns.

4        DR. KIRWIN:  That is what is on the tapes and my

5    understanding and my questioning in the therapy sessions with

6    Jason is I do not believe, or at least he is not indicating to

7    me, that was his intention, that his intention was to stop at

8    that point, to pay off what his parents needed to get out of

9    their difficulty.

10        THE COURT:  Your report doesn't get into the specifics

11    either.

12        DR. KIRWIN:  No.

13        THE COURT:  When costs were incurred, when payments

14    were made, when diagnoses were made.  Of course, some of the

15    most damning tapes are from 2008.

16        DR. KIRWIN:  Yes.

17        THE COURT:  Well after the 32,000 was paid when there

18    are plans to do more and no one speaks to that.  Your

19    suggestion is, what, at that point already received $32,000 he

20    now is just talking because it was his mental illness speaking,

21    there was no real plan?

22        DR. KIRWIN:  That is what I believed because I

23    didn't -- I don't see him utilizing that information in any

24    way.

25        THE COURT:  There was information that was transferred

18J6GULS

1    in 2008.

2            DR. KIRWIN:  Trading.

3            THE COURT:  It wasn't Mr. Goldfarb who did the

4    trading.  The trades were done.

5            DR. KIRWIN:  No, but he could have certainly

6    purchased.  If his intention was to continue to make these

7    really big bucks on this, he certainly would have been able to

8    trade on it.

9            THE COURT:  The claim was never for Mr. Goldfarb to

10   trade on it.  The claim was for Goffer and others who could

11   trade under the radar to make money and then pay money to the

12   sources and Mr. Goldfarb.  Mr. Goldfarb got a full third, an

13   equal share with the sources.  The plan in February and March

14   of 2008 was to continue doing this on a bigger scale.  There

15   was information that was conveyed in fact at that time period.

16   It didn't ultimately pan out the way the earlier trades had.

17           It is difficult to see based on the record how one

18   could conclude that he didn't intend to go forward with the

19   plan in February or March of 2008.

20           DR. KIRWIN:  Well, if he had even continued to go

21   forward with the plan, what I see for him at that point in time

22   was really extremely manic behavior and we were seeing some

23   examples of that earlier on.  In the Probation report there is

24   an indication or suggestion of the possibility of remanding him

25   for his own safety at this point in time because both

1    Mr. Minus-Shepherd and Powers were both seeing this kind of

2    escalation of this manic, really out-of-touch behavior.  It is

3    almost when a car red lines.

4         THE COURT:  In March of 2008.

5         THE DEFENDANT:  No, at this time currently.

6         THE COURT:  I am focused on during the scheme.  What

7    you said is that you don't believe that the tapes which reflect

8    him talking about a lot more money are reflective of an actual

9    intent to do that and I think that is extremely implausible and

10   very hard to square with the evidence in the case.

11        DR. KIRWIN:  I see it as more of his manic

12   grandiosity, and I am not sure that if he had been stopped at

13   that point if in fact that would have continued.  Because I

14   think if you listen to him on the tape, it is in no way what

15   anybody hears about him in real life.  You have seen people who

16   know him as a colleague, his family members, clients and there

17   is a consistent thread that runs through what this man's

18   personality and character.  What I have to look at as a

19   clinician is okay what the character and then what is the

20   mental disease or defect, like an overcoat that goes on top of

21   that that warps or distorts the character that makes an

22   individual do something that is so against their moral compass

23   when they are in their right mind.  And that is what I think we

24   see with Mr. Goldfarb is the perfect storm and what I look

25   towards is how do we in terms of punishing, in terms deterring

18J6GULS

1    all of those things very important and I am 100 percent behind

2    that but how do we bring him back into the community a whole

3    person, how do we keep him in the community, how do we make

4    sure that not only is something like this never going to happen

5    again, and I believe it never will just based on his character,

6    but how do we when we have this opportunity to intervene to do

7    what we know in the psychiatric profession is a way to stop

8    this biological genetic disease from progressing such that he

9    will never be able to help and assist in any way in any way to

10    any of his clients.  I know he will never be able to assist as

11    an attorney that that is a concern I have.  And the model that

12    I see is what was accomplished with Probation, which is really,

13    really comprehensive and extensive and lengthy probation, with

14    house arrest, with alcohol treatment, with gambling treatment,

15    with mental health treatment and medication monitoring and

16    very, very extensive community service.

17            THE COURT:  Thank you, Doctor.  I appreciate it.

18            Mr. Tarlowe I think is going to get a chance to speak

19    and then I will hear from Mr. Goldfarb.

20            Mr. Tarlowe.

21            The court reporter has asked for a break.  We started

22    at 10:00 and it is now noon.  So why don't we take a 10-minute

23    break.

24            (Recess)

25            THE COURT:  We'll hear from Mr. Tarlowe at this point.

18J6GULS

1        MR. TARLOWE:  Thank you, your Honor.  For the reasons

2   that we set forth in our sentencing submission, we do believe

3   that a guideline sentence is appropriate and is warranted here.

4   I don't intend to speak at any great length, but I would like

5   to touch upon some of the factors the Court must consider that

6   I don't think have really been addressed.

7        THE COURT:  Look, I understand the factors but I do

8   think also everybody has responsibility to address the

9   different factors and objectives of sentencing and to respond

10  to some of the points made because there are a group of people

11  here who obviously will leave this courtroom and want to

12  understand what happened.  So I think it is important to

13  respond as much as you can to the points they've made.

14  Sometimes very, very powerfully and emotionally but thoughtful.

15       MR. TARLOWE:  Certainly, Judge, I will try to do that.

16  In doing that, I will touch upon the nature and seriousness of

17  the offense, the actual role that this defendant played in that

18  offense as well as the need for just punishment and general

19  deterrence.

20       One thing I wanted to talk about was the defendant's

21  motivation for engaging in the conduct.  I think that is

22  something that we heard a tremendous amount about from the

23  letters that were submitted on behalf of the defendant as well

24  as from people who spoke today on his behalf.  We have heard a

25  lot about how this was conduct that he engaged in out of

18J6GULS

1   necessity and how he had no choice.  Was it his fault?  To be

2   clear, I don't dispute and I have no basis to dispute what we

3   have heard about the circumstances that his mother and father

4   faced.  But the picture that has been painted of Mr. Goldfarb

5   as somebody who engaged in this conduct not for any personal

6   gain, not because of greed but only out of necessity and

7   desperate circumstances, I think that is a picture is that very

8   hard to reconcile with the picture that emerges from the

9   evidence, most specifically the wiretaps, the phone calls.

10          The calls made clear that Mr. Goldfarb expressed no

11   discomfort, no hesitation about engaging in this conduct.  He

12   didn't appear to have any reservations about it, but quite to

13   the contrary was very active, enthusiastic, participant in that

14   conduct.  He is not somebody who appeared on those tapes to be

15   doing this out of desperation.  On the calls he repeatedly

16   talks about how much money they can make.  He clearly was very

17   excited and eager when he learned from Mr. Goffer that Zvi

18   Goffer had gotten a job at Galleon, this hedge fund where they

19   could double, triple, quadruple the size of the trade, could

20   increase the amount of money they were making and could conceal

21   or camouflage what they were doing because Galleon was so big.

22          Mr. Goldfarb said things on those calls like, We're

23   talking millions.  Everyone one of us should be set for life

24   within a year or two if things are played right.  We're going

25   to make a fortune this year.  Then he talks about how he spent

18J6GULS

 1    the money the $32,500 that he got and he says to Zvi Goffer, I

 2    am at the point where I need to refill, Dude.  I need another

 3    one.  I got to refill.  Again, it doesn't sound like somebody

 4    who is doing this out of desperation.

 5           He also had many opportunities to stop the conduct

 6    along the way.  This was not a momentary lapse in judgment.

 7    Several people have referred to it as a mistake.  This wasn't a

 8    mistake.  This was a conscious decision that he made repeatedly

 9    over a period that spanned nearly a year from the summer of

10    2007 to at least May of 2008.  I think respectfully I would

11    suggest to the Court that Dr. Kirwin's suggestion that that

12    talk was -- certainly there was some exaggeration on those

13    calls.  I don't dispute that.  But the suggestion that that

14    talk did not reflect the actual plan that they had is just

15    belied by the evidence.

16           THE COURT:  You attached several transcripts and you

17    brought the recordings?

18           MR. TARLOWE:  Yes, your Honor.

19           THE COURT:  I may ask you to play one of those later.

20           MR. TARLOWE:  Certainly.  But as late as March 2008

21    Mr. Goldfarb is providing information about Clear Channel.  The

22    Court is familiar with that evidence.  As the Court I am sure

23    recalls in March 2008 that is when the Ropes & Gray lawyers

24    actually got the information wrong.  Zvi Goffer was in a panic

25    about public reports that the deal was collapsing.  He turns to

18J6GULS

1    Mr. Goldfarb, Goldfarb goes and meets with the lawyers and

2    there is a series of events through the night and into the next

3    day.  And then in May 2008, in mid-May 2008, he began relaying

4    additional information about Clear Channel and at that point

5    the Clear Channel deal did close.  So this is conduct he did

6    engage in through at least May 2008 that related to a number of

7    stocks and it was repeated time and time again.

8              I think another fact that is difficult to reconcile

9    with this picture that has been painted as somebody acting out

10   of desperation is that in February 2008 it is our understanding

11   that Mr. Goldfarb actually got a new car in February 2008.  He

12   got a new BMW 528.  Obviously nothing wrong with that, but I

13   just think it is difficult to reconcile that with somebody who

14   is supposedly doing this to help his parents and we have heard

15   this was somebody who didn't have a lavish lifestyle, that

16   every penny went to his parents.  To be clear, I cannot trace

17   those dollars.  It may be that the $32,000 went to his parents.

18   I don't know but it does appear that he attained a new vehicle

19   that I suspect costs upwards of 35 or $40,000 in February 2008

20   while was still engaged in this conduct.  So if he was doing it

21   out of necessity, certainly he could have sought a more

22   economical car and used that money for better use.

23             I also want to talk a little bit more about the

24   defendant's role in the offense and some of the specifics about

25   the conduct here.  I think a lot of the speakers here today who

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

18J6GULS

1    obviously spoke from the heart and had very nice things to say

2    about Mr. Goldfarb, I think they have the window into one

3    aspect of his life and it certainly is an aspect of his life

4    that the Court should and will I am sure will consider when the

5    thinking about the history and characteristics of the

6    defendant, but that is only one aspect of the defendant's life.

7    And I think that a lot of the people who spoke do not have a

8    window into another aspect of his life that your Honor has been

9    privy to and that is the offense conduct.  I just suspect that

10   a lot of these people are not familiar with the facts of what

11   the crime entailed and what Mr. Goldfarb himself did.

12         Mr. Goldfarb, as the Court pointed out, recruited the

13   Ropes & Gray lawyers into this scheme.  He helped corrupt those

14   attorneys.  He was paid the same as the Ropes & Gray lawyers

15   for providing information to Zvi Goffer.  He also had a greater

16   understanding of the scope and magnitude of the scheme than the

17   Ropes & Gray lawyers did.  He didn't know all of it, but he

18   certainly knew Zvi Goffer and Emanuel Goffer were using the

19   information and he had a better understanding of the magnitude

20   of the trading because he was in direct contact with Zvi Goffer

21   and Zvi Goffer talked to him about that.  He also provided both

22   sets of prepaid phones to Ropes & Gray lawyers, which he got

23   from Zvi Goffer, and he gave instructions to the Ropes & Gray

24   lawyers, Mr. Santarlas and Mr. Cutillo.

25         He said things so Zvi Goffer on the phone, like, when

1    they are talking about information that had come from the Ropes

2    & Gray lawyer, Mr. Goldfarb said, That is me drilling it into

3    them.   The last one never would have happened if I don't press

4    them and drill them every single time.   There was another call

5    where Zvi Goffer was telling Goldfarb what to say to the Ropes

6    & Gray lawyers and Mr. Goldfarb said let me write this down.

7    You have to bullet point everything for these guys.   So he was

8    a very significant and active participant in the criminal

9    conduct and his roles with a significant one.   We don't think

10   his role was merely one of a go-between as has been

11   characterized by Mr. Soshnick.

12          I think it is also worth noting that it is clear that

13   Mr. Goldfarb has been very dedicated to his clients and has

14   produced what appeared to be extraordinary results for some of

15   them.   We don't take issue with that and we think that is

16   something that the Court should and can take into account.   But

17   as a lawyer, the defendant also had other obligations, other

18   ethical obligations besides the duties that run to his clients.

19   Every lawyer has a duty to abide by the law like everybody else

20   and lawyers actually have a duty and ethical obligation to

21   report misconduct of other lawyers.   Far from doing that Mr.

22   Goldfarb actually actively encouraged and facilitated the

23   commission of crimes by other attorneys as well.

24          Certainly a lot of the people who spoke it is very

25   moving to listen to them.   It certainly was.   It is obvious and

18J6GULS

1   very clear that another category of victims in this case is Mr.

2   Goldfarb's family and his friends.  They clearly have been hurt

3   by this and will continue to be hurt by it.  Unfortunately I

4   think a reality of the criminal justice system is that when

5   people commit crimes and get punished for committing those

6   crimes that punishment impacts not only the defendant him or

7   herself but the friends and family of the defendant and that is

8   a real and unfortunate consequence of engaging in criminal

9   activity.

10          I think there are also other categories of victims who

11   we don't get to hear from, the investors who are hurt by this

12   type of conduct.  We don't have somebody to come in and

13   represent those investors.  This type of conduct undermines the

14   integrity of the market.  It undermines investors' right to a

15   fair playing field, a fair market.  We don't get to hear from

16   those people.  There are a number of different categories of

17   victims some of which the Court has heard from but some of

18   which the Court does not get to hear from.  I think it is also

19   important that the Court takes into account the impact that

20   this conduct has on those victims as well.

21          I want it talk very briefly about the efforts tod

22   cooperate to make sure the Court has a clear picture of what

23   happened.  From an early point Mr. Goldfarb did through his

24   attorney express a desire to cooperate.  There was a proffer

25   very early on that related to other unrelated activities.  The

18J6GULS

1    proffer did not cover the conduct at issue here because the

2    government's view was that it wasn't interested in Mr.

3    Goldfarb's cooperation.  As the trial approached, Mr. Goldfarb

4    obtained new counsel, Mr. Soshnick.  Mr. Soshnick again

5    reiterated his interest in cooperating that we didn't have an

6    interest in Mr. Goldfarb's cooperation.

7         After repeated discussions and persistence frankly of

8    Mr. Soshnick, we agreed that we would meet with Mr. Goldfarb

9    for a proffer with the understanding that we viewed it as

10   extremely unlikely that we would agree to use his cooperation

11   to give him the 5K letter.  We met for two proffers on that

12   understanding.  Mr. Goldfarb did sit with us for a number of

13   hours and answer a lot of questions.  We made the decision that

14   we did not feel that we needed his assistance and we didn't use

15   it.

16        Two things that did come out of the proffers:  One,

17   Mr. Soshnick mentioned there was a piece of paper with Zvi

18   Goffer's handwriting that Mr. Goldfarb gave us.  We did not

19   introduce that as an exhibit at trial.  However, Mr. Goldfarb

20   did provide information about a safe deposit box that he had

21   opened I think within a day or two of the acquisition being

22   announced.  We were then able to obtain the records of that

23   safe deposit box and we did introduce those records at trial.

24        I think the only other thing I wanted to say, Judge,

25   is in terms of general deterrence, something that the Court has

18J6GULS

 1    alluded to, is something that is very important here.  This is

 2    a crime that presents a potential for very significant

 3    financial rewards.  It is also a crime that is difficult to

 4    detect and difficult to prosecute.  I think especially in light

 5    of those realities, it is important that there be substantial

 6    punishment for people who are caught engaging in this so that

 7    as other people think through that calculus in their mind of

 8    the potential benefits and one hand, the difficulty of the

 9    government detecting and prosecuting people, I think it is

10    important that people faced with these types of choices

11    understand there are very substantial penalties for this type

12    of conduct.

13         Unless the Court has any questions, I don't have

14    anything else.

15         THE COURT:  With respect to forfeiture, it is not

16    restitution, it is just forfeiture?

17         MR. TARLOWE:  Just forfeiture, your Honor.  We have a

18    proposed order of forfeiture.  The amount is the amount of the

19    stipulated gain in the plea agreement, which is $1,103,131.

20         THE COURT:  All right.

21         Mr. Goldfarb, you have a right to address the Court.

22    You don't have to.  As you know, you have a right to and you

23    are welcome to.  I guess you are at the point in the proceeding

24    now that that is all that is left before I impose sentence.

25         THE DEFENDANT:  Do you want me to sit here or stand

18J6GULS

1    here?

2          THE COURT:  Whatever you are comfortable doing.  Speak

3    slowly so the court reporter can get it all down.  You can move

4    the box of tissues.

5          THE DEFENDANT:  I have a written statement prepared,

6    but some of the questions that you asked some of the people and

7    some of the things that you seem troubled by as well, I am also

8    troubled by.  It seems that you are also focusing on the time

9    line.  I don't think anyone had specifically correct.

10         I was approached by Zvi Goffer around 2006 and all he

11    told me at the time was, Jason, listen, you are an attorney if

12    you know anyone that does corporate type stuff like that, let

13    me know.  He didn't allude to why or anything like that at the

14    time.  It wasn't until actually probably around 2005.  Then in

15    2006 I had been ran into Cutillo.  We were, I think, at a card

16    game and he had said to me his firm merged with another firm

17    and he is doing some type of corporate law.  I said, You have

18    to meet my friend Zvi he had mentioned something.  It was after

19    that.  Still at the time I didn't know what Zvi was talking

20    about.

21         Then we went to a dinner and that is when Zvi had laid

22    out this idea.  This is back in 2006.  And both Cutillo and I

23    talked about it.  I wasn't really going to be a player in this

24    thing.  Cutillo, listened and said, Oh, not really interested.

25    It wasn't until the time when all this other stuff was going on

18J6GULS

1    with my parents and my parents' woes and my mother's condition

2    that right around that time is when all of a sudden I got this

3    phone call from Cutillo.  I followed what happened at the trial

4    and I followed and I would be able to read about in the papers.

5    I still think it is somewhat wrong.  I believe I would never

6    come here and lie today.  It could only hurt me.

7         My understanding the way it was explained to me is

8    that Mr. Santarlas actually approached Mr. Cutillo saying that,

9    listen I have access to this information and I am going to

10   trade this information on my own.  And that is when Cutillo who

11   had his own personal circumstances going on had said to him,

12   Wait, I think there is a better way and that is when it all

13   started happening around that time.  So the time line that is

14   given I think is a little bit skewed.  I am not making any

15   excuses.  I just wanted it to be clear exactly what was going

16   on.

17        Shortly to rebut the thing about the car.  My company

18   at the time, that is the car they gave me.  It was through

19   them.  It really didn't cost me that and the parking was paid

20   on by my firm at the time.

21        Your Honor, I stand before you a broken man.  I make

22   no excuses for my conduct and I take full responsibility for my

23   actions.  I can promise you two things:  The first thing that

24   you have never had a defendant stand before you more repentant

25   and sorry.  I have and continue to apologize not only to all my

 1    family, friends and clients but to your Honor, the government,

 2    and all those harmed in any way by my actions.

 3         Next I can assure you that there as an absolute

 4    impossibility that you or ever judge will see me again as a

 5    defendant in a criminal action.  I know the saying is there are

 6    no certainties in life, but I swear to your Honor this in fact

 7    a certainty.  It is not easy for me to stand here and speak in

 8    front of all these people.  I am humbled, appreciative but feel

 9    very undeserving of all their love and support.  Family has no

10    choice but to love and support you, but the amazing outpouring

11    I received from all my clients is quite possibly the only thing

12    that has gotten me through this time.  On many dark days they

13    were reminding me of some of the good I managed to do

14    throughout my life and for this I thank them.

15         As my family, friends and clients who are here today

16    confessed, I have always held myself to a very high standard in

17    all aspects of my life for a very long time.  I know I let

18    myself and so many others down and nobody can or will punish me

19    more than I have and will continue to punish myself.  Over the

20    pat 20 months, I began to take steps and look into how I got

21    myself into this situation and ensure that it never happens

22    again.  I dedicated myself to treatment with Dr. Kirwin, who

23    surprisingly I have been able to open up to and I found my time

24    with her extremely help.  You have but only one life to live

25    and I have forever tainted mine.  I set out to help those I

1  love but ended up making things so much worse.  I will never

2  forgive myself for the pain and hurt I have caused so many

3  people close to me.

4        However, the biggest punishment of all to me is that I

5  am being stripped of my ability to represent my clients who I

6  consider family and hold so dear.  As my mother can tell you,

7  since I was about eight years old I had always wanted to be an

8  attorney.  Against all odds, I became one.  I devoted the time

9  I spent as an attorney making sure my clients always got what

10  they deserved and were never taken advantage of.  To me there

11  is no worse punishment than being told I can no longer do that.

12        From the start of my situation, I have tried to do

13  absolutely everything in any power to make amends for my

14  actions.  This includes proffer sessions with the government,

15  turning over any and all evidence I had access to to them

16  immediately and I have and I will continue to cooperate with

17  the SEC in their ongoing investigation.  After my sentence here

18  today, your Honor, I assure you that I will not stop trying to

19  help.  Everyone speaks of general deterrence and I agree that

20  is definitely an important goal.  My goal would be to deter

21  others in society from making the same mistakes I have.  If the

22  Court will permit me I would like to speak at law schools and

23  perhaps colleges to discuss the mistakes I have made and try to

24  ensure that other people and lawyers not travel down the same

25  path as I did and make the mistakes I have.  I feel there are

18J6GULS

1    many ways to send a message to society and perhaps this will be

2    the strongest way for me to do that.

3         Judge, if you are willing to take a chance on me, I

4    will promise you will never regret it.  I will tackle this

5    challenge and responsibility of everything I have and I swear

6    to your Honor you will not be disappointed and I hope that one

7    day I can become an example of someone who was able to gain

8    respect of society and those around him including your Honor.

9    Thank you.

10        THE COURT:  Thank you, Mr. Goldfarb.

11        Mr. Goldfarb, ladies and gentlemen, let me tell you

12   what we'll do now.  At this point I will state the sentence I

13   intend to impose and I will offer my reasons for it.  I will

14   then after that ask the lawyers if there is any legal

15   impediment or any reason under the law that I can't impose the

16   sentence that I have in mind.  If there is none then I will

17   formally impose sentence.

18        In our system judges explain their reasons for

19   sentencing.  There is no need for any defendant, there is no

20   need for any person in a courtroom to guess what a judge is

21   thinking at the time of sentencing.  Judges are obliged to

22   provide their reasons, to provide an explaination as what they

23   considered, what they weighed and what mattered to them in

24   reaching a determination that is of obvious importance to the

25   defendant but also has serious, serious repercussions for other

18J6GULS

people, family members, friends and others.

So it is important for the Court to do this.  It is
important for the Court to weigh the different objectives of
sentencing because at the end of this proceeding each of you
will leave and you will have a sense as to what happened here
today and whether this system works or whether it is worthy of
the name court of law and court of justice.  It is impossible
that everyone will leave this courtroom in agreement with the
sentence that is imposed.  Just listening to the two lawyers I
think it makes it clear a range of opinions as to what would be
appropriate and there is nothing I can say that will make
everyone in this room happy.

The goal I think or any goal of sentencing is to make
sure that people even if they disagree with the sentence will
understand and perhaps appreciate that this process was
careful, that it wasn't callus, that it wasn't mean spirited,
reflexive, that it was thoughtful and that it was careful.
That is what I think the most one can ask for a human
institution and that is what I will endeavor to do now.

There are different objectives of sentencing, some of
which mentioned by the lawyers and others today are first of
foremost what we spent a lot of time talking about, facts and
circumstances of Mr. Goldfarb's life, the defendant's personal
history.  That is important because no two individuals are
alike.  They are all unique.  And each has to be considered as

18J6GULS

an individual and the sentence imposed has to tailored to that

individual.

Another objective of sentencing, though, one the Court

has to consider, Congress has directed courts to consider it,

are the facts and circumstances of crime or crimes involved.  A

court has to impose a sentence, and Mr. Goldfarb know this

because we talked about this at his guilty plea, a court has to

impose a sentence that is going to reflect the seriousness of

the crime.  That is going to promote respect for the law and

provide a just punishment for the crime.  Some of the letters

that I received, and I do want to again tell you how much I

appreciated the letters, the thought and time that went into

them, but several said that the process should not be punitive,

that it should be much more about rehabilitation and

recognizing the need to give a second chance to the defendant.

Here the latter part has to be part of the equation, but there

is a punitive component to sentencing.  There is a notion of

just punishment that a crime that is serious requires

punishment because that punishment is crucial to promoting

respect for that the law.  So that is something the Court has

to consider.

So Mr. Tarlowe focused on the facts of this crime,

which was not a spontaneous crime.  It was a crime over many,

many months with many individuals involved.  The details

matter.  So that is something that the Court has to focus on

18J6GULS

1    and cannot lose sight of even though obviously the things that

2    friends and family members have to say are more urgent to them.

3    The Court has to balance these other things.

4         Another objective of sentencing the Court has to

5    consider is the need to deter the defendant and others from

6    committing crimes like this in the future, both specific

7    deterrence and general deterrence.  This is something that

8    courts have to take seriously.  Sometimes it is hard to

9    quantify general deterrence.  It is very hard to know what

10   effect a sentence on one individual on one day in a courthouse

11   in New York is going to have on other people throughout the

12   land.  It is difficult to quantity.  I think we all know

13   intuitively that there is something to that that sentences

14   imposed, particularly in cases that are being paid attention

15   to, do have an effect.  They do have an impact on others and

16   sometimes on entire industries.  That is a something the Court

17   has to consider.  Sometimes that factor weighs more heavily

18   than in cases where general deterrence is not a major

19   consideration, other cases where general deterrence is a major

20   consideration by virtue of the circumstances of the case.  So

21   that is something the Court has to take into account.

22        The sentencing guidelines are another thing that the

23   Court has to consider.  That is not to say that sentencing

24   guidelines should be slavishly followed.  They are not

25   mandatory nor should they be in my view.  Certainly no one I

1   think could accuse me of slavishly following the sentencing

2   guidelines.  I depart below these guidelines more than

3   50 percent of the time more than most of my colleagues in this

4   district.  Look, every sentence is individual so I don't think

5   that statistic means much, but I understand my ability to go

6   below the guidelines and I understand the guidelines are just

7   one factor to be considered.  They are an important factor

8   because the goal of these guidelines, the goal of the process

9   of looking at individual crimes and applying objective criteria

10  based on the amount of gain, based on other factors involved in

11  the offense is to ensure that people who are similarly situated

12  or roughly equivalent get roughly the same punishment.  There

13  is something that undermines the credibility and the respect

14  for which people owe their court system if sentences vary

15  wildly depending on simply who the judge is, who the lawyers

16  are or who is the defendant happens to be or know.  That is

17  something courts clearly have to take into account.

18          We've talked about these and I have taken them into

19  account.  I told you what the range is, which is under the

20  guidelines 37 to --

21          MR. SOSHNICK:  46.

22          THE COURT:  -- 46 months.  It is a significant amount

23  of time by any imagination.

24          Another factor I have to consider are the needs of a

25  criminal defendant.  There are many defendants who appear in

18J6GULS

front of me who have medical needs, substance abuse problems
and other things that they need to be considered in fashioning
an appropriate sentence.

The hard thing about being a judge is balancing all of
these factors.  If the only consideration were the defendant
and his history or the likelihood of the defendant returning to
crime, it would be easy.  The only consideration was the impact
that a sentence would have on a defendant's family.  It would
be easy.  There is a reason why parents and siblings and
spouses and friends are not asked to impose sentence on
defendants.  They can't.  They are too close.  They cannot put
aside the obvious emotional connections, the obvious ties that
they have to a defendant.  The hope is that a judge who is
unbiased, impartial will be able to weigh these different
factors, balance them, to fashion a sentence that does justice
to each even though there is often tension between and among
the different objectives.

So that is what I am charged with doing.  It has been
a difficult task.  I will not lie to you.  It is something I
thought a great deal about.  I spent a lot of time thinking
about it, reviewing the submissions, reviewing other cases and
sentences imposed in those case.  I will start with the
defendant's personal history, the facts and circumstances of
Mr. Goldfarb's life.  It is a very long presentence report.  It
is 30 pages long as I mentioned.  There are numerous letters in

1    this case, 60 or so.  It is about as many as I have received in

2    any case.  It is not just the number of them, the quality of

3    them.  They are well written and very articulate.  It is from

4    people who are speaking from the heart.  So I appreciate as I

5    said this multiple times the time that went into those letters.

6          From those letters, from the presentence report

7    certain things are obvious to me.  First, that Mr. Goldfarb was

8    and is a good son.  There is no question about that.  It is

9    heartbreaking to listen to his parents speak.  Naturally this

10   has been overwhelming for them and I am sympathetic as a parent

11   myself.  I can sympathize without understanding what they are

12   going through.  I sympathize.  There is no question he has been

13   a good son.  He loves his parents and respects his parents and

14   he has treated them well.  He hasn't done anything to shame

15   them up to this point and he has a been a model son.  I think

16   that is worth noting.  It is an admirable quality that will not

17   change after today.  It will continue.  And it is to your

18   credit, Mr. Goldfarb.

19         Another thing that is obvious from these letters is

20   that Mr. Goldfarb is a good lawyer, a passionate lawyer, a

21   lawyer who cares about his clients and who enjoyed the

22   profession and who did well in the profession.  I don't think

23   there is any question about that.  That is the truth.

24         Another fact that I don't think can be denied is

25   Mr. Goldfarb say nice person.  Certainly I see nothing to

1   suggest otherwise.  He has been respectful every time he has

2   been in court.  Today is no exception.  More than that the

3   people who know him speak to that quality again and again.

4   Even the tapes, which are damning evidence of the crime, do

5   reflect a person who is a decent guy on a personal level,

6   someone who is likeable, who is charismatic, fun, who is nice.

7   So I don't think anyone can dispute that.

8           Another fact that I think cannot be disputed obviously

9   there are many, many people who care about Mr. Goldfarb.

10  Almost unprecedented, perhaps unprecedented in any experience

11  to have a sentencing proceeding attack this many people, this

12  many people who wish to speak and address the Court, this many

13  people who have been here all day, all morning because they

14  care about Mr. Goldfarb and what happens to Mr. Goldfarb.  That

15  is to his credit certainly.  What is also obvious to me is that

16  those people and others who wrote letters, those are people who

17  care about Mr. Goldfarb and are suffering.  This is something

18  that has been painful.  It is obvious to me.  It is not lost on

19  me and it is something that is moving.  It is natural to see

20  that and want to help, want to do something to alleviate that

21  pain.  I can understand that.  It is heartbreaking to read the

22  letters and hear people speak and certainly possible to be

23  moved.

24          Again, this has to be put in perspective as well.  The

25  facts and circumstances of Mr. Goldfarb's life require the

1  Court to consider some other facts, which are first of all I

2  sentence many defendants.  There are many defendants sentenced

3  in this courthouse and courthouses like it all over the

4  country.  Very few resemble Mr. Goldfarb in many different

5  ways.  Mr. Goldfarb has had tremendous advantages that most

6  defendants that I sentenced haven't had.  That is a fact.  I

7  think anyone familiar with this system would have to readily

8  agree with that.  Mr. Goldfarb had and has loving parents.

9  From the moment of his birth, he has had parents devoted to

10  him, sacrificed for him, made it their business and life to

11  ensure that he had opportunities that they didn't have and that

12  he would be able to reach his full potential as a man.  That is

13  a rarity in life.  We all know that.  It is more than a rarity

14  in federal court.  Mr. Goldfarb was blessed to have that.  He

15  wasn't born a millionaire.  He got something better than the

16  lottery, he got parents who care.  Not just care, I mean love

17  him with a devotion that is hard to see and not be moved by it.

18       Another thing that Mr. Goldfarb has had is an

19  education.  Very few defendants who both have the aptitude and

20  ability and the opportunity to get a quality education such as

21  Mr. Goldfarb got from grammar school, high school and college

22  and on to law school.  That is unusual that a person with that

23  sort of talent and that sort of opportunity to realize and take

24  advantage of that talent shows up in federal court.  Much more

25  common than people who do not have the aptitude or worse don't

1    have the opportunity to exercise that aptitude because of

2    circumstances of their birth and lives.  Mr. Goldfarb had that.

3    That is a tremendous advantage.

4           Health.  Mr. Goldfarb has had unusually good health.

5    He has been able to play sports.  He has a body that does what

6    he tells it to.  He is able to work long hours and still able

7    to maintain relationships.  There has been talk about the

8    psychological report, which details test results as well as

9    certain conclusions.  I think Dr Kirwin for it.  It was

10   helpful.  But the reality is there are many defendants who

11   appear in this courtroom have much more severe mental health

12   issues than Mr. Goldfarb, who have debilitating mental health

13   issues that they are unable or unwilling to deal with, most

14   cases unable because of their circumstances, and whose problems

15   are such that even if they have the resources it would be

16   difficult to deal with them because they are difficult,

17   difficult problems.  Mr. Goldfarb although he could have a

18   drinking problem, he is not under the kind of addiction that is

19   very common with defendants seen in this courthouse.

20          Finally, Mr. Goldfarb has a profession.  Not just a

21   job, a profession, a career.  A career that entitles him to do

22   something he enjoys.  He does something that is satisfying,

23   something that entitles him to make a pretty good living.  It

24   is a profession that carries with it prestige, respect and the

25   prospects for more and more succes.  He was good at it,

18J6GULS

1   successful at it, he was moving up and he was assured more

2   success.  That is unusual.  Material success can be measured a

3   lot of different ways.  Mr. Goldfarb, although early in his

4   career had already achieved pretty significant amount of it.

5   He was living on the Upper East Side in the neighborhood among

6   the wealthiest zip codes in America.  He wasn't a millionaire,

7   but he was doing well.  And as long as he continued to apply

8   himself, as long as he continued to be ethical and law-abiding

9   there is no reason to think that he would do better and better

10  and he would not have a very comfortable life, perhaps even

11  wealth.

12          To listen to the clients of Mr. Goldfarb's speak I am

13  very confident this is a person who was going to be very, very

14  successful in the law.  It was a matter of time that he was

15  going to make a good living at it and he was already making a

16  good living at it on the grand scheme of it.  He wasn't an

17  investment banker, but he was making a good living.  If he had

18  loans, those loans were not insurmountable.

19          He also was part of a profession and that is

20  something.  That is something.  Mr. Goldfarb has spoken about

21  that.  That is valuable.  Part of that profession requires one

22  to behave ethically and lawfully.  It is a profession that

23  demands ethical behavior from its professions.  Mr. Goldfarb

24  took ethics courses in law school.  He had to take an ethics

25  examine that he had to pass in order to be admitted to the bar.

18J6GULS

He had to pass through a character and fitness examination in order to be received into the New York bar as part of the process of being admitted.  He is required to take continuing legal education courses on ethics, a profession that demands ethical behavior and conduct.

Mr. Goldfarb I think in the grand scheme of things had advantages that most people don't have.  Although many of the qualities we talked about are to his credit.  There are decisions he made that were good ones.  He earned and worked hard.  It is important to remember that in assessing the crime and decisions made by Mr. Goldfarb.  He was one of the lucky ones.  One of the winners in life.

The other thing or the next thing I have to consider is the facts and circumstances of this crime.  As I said the sentence has to reflect the seriousness of the crime and promote respect for the law.  For many months -- this is undisputed -- Mr. Goldfarb was one of the leaders, one of the movers of a sophisticated scheme that was designed to steal privileged information, confidential information from a law firm and its clients to be used to make lucrative inside trades by hedge fund managers and traders.  That was the goal of the scheme and that was the purpose of this scheme, to steal and to profit from it.  Theft from the rightful owners of the information, breach of fiduciary duties and ethical obligations and enrichment of the insider traders at the expense of those

18J6GULS

1    traders and investors who played by the roles who knew they

2    were not entitled to trade on the basis of inside information.

3              This kind of conduct has consequences, consequences to

4    the innocent investors who as Mr. Tarlowe said are not here who

5    got suckered on the wrong end of an inside deal.  In addition,

6    it seriously and significantly undermines investor confidence

7    in our financial markets.  It breeds a cynicism that is

8    palpable in this day and age.  That is one of the things that

9    came out of this case, it has demonstrated that this is a

10   rigged game.  It is not an illogical conclusion for someone to

11   draw if they follow this trial and others like it in the recent

12   past.  There is a sense that sophisticated, powerful people are

13   capable of bribing and stealing information that ensures them

14   of profits.  That is what this scheme was.  It is about bribing

15   and stealing.  There is no way around it.

16             Mr. Goldfarb recruited Mr. Cutillo, his college

17   roommate.  We can quibble about how the conversations went, but

18   the fact is it is a recognition that Mr. Cutillo had access to

19   the information and that information could be valuable to Mr.

20   Goldfarb's other friend Zvi Goffer.  Mr. Goldfarb who

21   encouraged those lawyers, Mr. Cutillo and Mr. Santarlas, to

22   steal that information from their firm and from their firm's

23   clients.  I am not saying they were will was overborne.  Far

24   from it.  They are guilty.  One has been sentenced and the

25   other will be sentenced.  It was Mr. Goldfarb who willingly

18J6GULS

1  shuttled that information to Mr. Goffer.  It was Mr. Goldfarb

2  who shuttled the profits back to the sources and kept a full

3  third of the bribe as it were.

4       What went to the sources was split three ways,

5  two-thirds to the lawyers inside the firm who got information

6  and one-third to Mr. Goldfarb.  This is a serious crime.  It is

7  a serious crime and it has got to be treated seriously.  This

8  is not a momentary lapse in judgment.  It is not an impulsive

9  act.  It is not stealing bread when you are hungry.  It is just

10  not what it is.  It is impossible to say that.  Mr. Goldfarb in

11  your letter to me, which was a thoughtful letter and moving

12  letter and I say just this one point or suggest that.  I didn't

13  focus on the rest of it.  But what you said in your letter is,

14  For a second in a weakened state I made a horrible decision,

15  and that is not quite accurate.

16       You made a series of decisions over a long period of

17  time that had consequences.  You made the decision each time.

18  It wasn't an impulsive decision.  It wasn't a compelled

19  decision.  You went on doing this for months.  This involved

20  clandestine meetings, secret prepaid phones that were obtained

21  for the express purpose of carrying out this crime and evading

22  law enforcement.  No question about it.  You and the others,

23  Mr. Cutillo and all the others involved, knew exactly what you

24  were doing.  You didn't hesitate for minute in carrying out

25  this scheme.  You expected to make a lot money and the money

1  paid out was not that great, $33,000.  But the plan was to make

2  a lot more.  The expectation was nobody was going to get

3  caught.

4          There is no illusion this wasn't criminal behavior.

5  Everyone knew it was criminal.  Everyone knew if you get caught

6  disaster follows.  You get arrested, you get disgraced, you get

7  disbarred, you get financially ruined and you go to jail.

8  Everybody understood that but it didn't deter a single player

9  in this process.

10          There is a tape here that Mr. Tarlowe alluded to in

11  this record.  I think it is worth playing the first recording.

12  I think many of the people who spoke here today are not

13  familiar with this case.  There is no reason why I shouldn't,

14  but this matters.  This is what the conduct was.

15          Can you tee it up?

16          MR. TARLOWE:  Certainly.  Exhibit A.

17          THE COURT:  Yes.

18          (Audio played)

19          THE COURT:  This is February 2008.  This is long after

20  the first deal in the fall.  This is obviously done with the

21  expectation that they are going to be doing more deals and they

22  are going to be bigger and they will make you and the other

23  sources wealthy, hundreds of thousands of dollars.  I don't

24  think there is any question about that, at least not in my

25  mind.  So understanding the criminal nature of this scheme, you

18J6GULS

 1    and Mr. Goffer were undeterred.   Deterrence is another

 2    objective of the sentencing.   The Court has to consider

 3    specific deterrence.   The goal of the sentence on Mr. Goldfarb

 4    is to make sure he doesn't commit crimes in the future.   I am

 5    not worried about that one.   I think most of you recognize that

 6    there is no need to worry about that.   I don't think he is

 7    going to engage in this kind of conduct again.   He has accepted

 8    responsibility.   I think he is remorseful.

 9          So I grant that but I have to say I do think this

10    constant repetition of the motivation as oversimplification as

11    to how Mr. Goldfarb got into this crime is a little troubling

12    to me.   I think letter after letter basically stated the reason

13    why Mr. Goldfarb got into this criminal conduct as though it

14    was an isolated incident.   And those who wrote the letters I am

15    not faulting because you didn't know the facts and I think all

16    you know is what you know from Mr. Goldfarb.   It seems to me

17    that on some level Mr. Goldfarb seems to have come up with

18    something that makes it go down easier.   This is an explanation

19    that is easier to live with, but it is not the whole truth.

20    There may be some truth to it, but it is a vast

21    oversimplification and I think after a while letter after

22    letter saying that it sort of felt like a campaign.   If felt

23    like a lobbying effort to get me to buy a set of talking

24    points.

25          Look, I don't think that Mr. Goldfarb is going to

1   commit additional insider trading in the future.  I don't

2   believe that.  It does suggest that there is a little something

3   to be desired from his understanding of what took place here

4   and his acceptance of responsibility.  General deterrence is of

5   course what is more a compelling objective of sentencing here.

6   Obviously there has to be a sentence, a message sent to a

7   broader audience.  Inside trading as I said is destructive, it

8   does real damage and it is highly lucrative.  It is hard to

9   detect and it is hard to prosecute.  For that reason, it is

10  important that when it is detected and when it is proven and

11  prosecuted that the individuals involved be treated seriously

12  and the penalties be severe because you have to send a message

13  to people that they cannot do this.  They cannot do this and

14  then when they are caught just come up with excuses or reasons

15  why they should be exempt from the penalties that come with

16  criminal activity.

17         The conclusion that has to be drawn here is this

18  conduct will not be tolerated.  There are people around this

19  country watching what happens in this case and other cases like

20  it.  So those engaging in this kind of conduct, they have to

21  understand they better be careful because when they get caught

22  they are going to be arrested, they are going to destroyed

23  financially, they are going to be disgraced, disbarred if they

24  are attorneys or delicensed if they are some other kind of

25  professional, and yes, go to jail.  They are going to go to

18J6GULS

1    jail.  That is what happens when people commit serious crimes.

2    They go to jail because that is how society expresses its

3    outrage at certain behavior.

4         So in some ways I think, Mr. Soshnick, you may have

5    done a disservice to your client and your client's family by

6    suggesting it was realistic to expect that there would be a

7    noncustodial sentence here.  Mr. Cutillo was sentenced a couple

8    months ago and he received a sentence of 30 months to the low

9    end of the guidelines range.  Mr. Cutillo who had his own

10   serious family circumstances, he has young children with

11   special needs, who are financially devastated by this and who

12   will continue to be affected by this obviously could have made

13   very powerful arguments for leniency, he chose a very different

14   approach to sentencing.  He said he was ashamed and knew he had

15   to be punished and acknowledged that he had betrayed everything

16   that he was taught as a young man and everything that he

17   believed as a lawyer.

18        Ultimately Mr. Goldfarb took a very different

19   approach.  I don't know which was right.  I don't know that one

20   is better than another.  It doesn't really matter.  The

21   sentence I am going to impose is not going to be determined by

22   the strategies dealing with sentencing that lawyers or

23   defendants need.  Each of these men, Mr. Cutillo and

24   Mr. Goldfarb, are a decent man.  I think each was a good

25   lawyer.  Each has people who care about them deeply.  Each has

1   people that is going to be affected by the sentence imposed.
2   They are just sorry for what they did, but nonetheless each
3   engaged in a different crime.  One can argue the relevant
4   culpability of each, but the fact remains that to sentence one
5   man to 30 months and the other to a noncustodial sentence I
6   think would be an injustice.

7          If anything in my line Mr. Goldfarb has been more
8   culpable of the two, although it was Mr. Cutillo that breached
9   the duties he owed to his firm and to his clients.  Mr.
10  Goldfarb was a willing participate in this scheme and knew
11  exactly what was happening and in fact is the one who
12  introduced Mr. Cutillo to the scheme.  To listen to these tapes
13  as I have, not just this one but the others, it is very clear
14  that Mr. Goldfarb as not merely a willing participant was an
15  energetic participant.  There is almost a giddiness on the
16  phonecalls.  There is a sense of what we're doing is dangerous
17  and exciting and it is potentially lucrative and I don't think
18  anyone can listen to these calls and come away and think that
19  this was a reluctant decision made by someone who is faced with
20  dire financial circumstances.  It rings hollow.

21         So it is my intention to impose a term of
22  incarceration of 36 months, three years.  That is a long time.
23  It is a little more than Mr. Cutillo, but for the reasons I
24  said it is appropriate.  It is a little below the guidelines.
25  The guidelines I don't let drive a decision.  I basically look

88

18J6GULS

1   at a crime, look at the conduct, decide in my own mind what

2   seems like a ballpark number and then I look at the guidelines

3   to see we're roughly in the same ballpark.

4       MR. SOSHNICK:  Your Honor, you are aware of the

5   Probation recommendation was 24 months.

6       THE COURT:  Do you for a minute imagine that I am not

7   aware of that?

8       MR. SOSHNICK:  Okay, your Honor.

9       THE COURT:  Are you serious, Mr. Soshnick?

10      MR. SOSHNICK:  I apologize, your Honor.

11      THE COURT:  Yes, I am aware of that.  I am aware also

12  the Probation recommendation doesn't seem to focus on many of

13  the factors that I been spending the last half hour talking

14  about.  So since the responsibility falls on me to impose the

15  sentence, I am certainly aware of the recommendation, but I

16  probably follow the recommendation of Probation with the same

17  frequency that I follow the guidelines.  Respectfully I think

18  they are valuable, but ultimately the decisions is mine.

19      My intention is so sentence Mr. Goldfarb to a term of

20  three years' incarceration to be followed by a term of

21  supervised release.  That term of supervised release will be

22  for a period of three years.  It will include the conditions

23  that I will go into in a moment, but are the ones set forth in

24  the presentence report.  I will impose a fine of $32,500.  As

25  well as restitution in the amount of a little over one million

1   dollars set forth in the proposed order that was part of the

2   stipulation at the time of the guilty plea.  Restitution is not

3   appropriate or applicable in this case.  I will impose a

4   special assessment of $200, $100 for each of the counts of

5   convictions.

6           Is there any legal impediment to my imposing that

7   sentence, Mr. Tarlowe?

8           MR. TARLOWE:  No, your Honor.  I think the Court

9   misspoke and referred to it as restitution rather than

10  forfeiture.

11          THE COURT:  I am sorry.  I did misspeak.  It is a

12  forfeiture order.  Restitution is not applicable.

13          Mr. Soshnick, are you aware of any legal impediment to

14  imposing such a sentence.

15          MR. SOSHNICK:  No, your Honor.

16          THE COURT:  Mr. Goldfarb, please stand.

17          Mr. Goldfarb, having accepted your guilty plea back in

18  April, I now sentence you as follows:  I sentence you to a term

19  of incarceration of three years, 36 months.  That is to run

20  concurrent on each of the counts of conviction, Count One and

21  Count Three.  In addition, I am going to impose a three-year

22  term of supervised release to run concurrent on Counts One and

23  Three of the indictment.  That term of supervised release will

24  include the following mandatory conditions:  You shall not

25  commit another federal, state or local crime.  You shall not

18J6GULS

1    illegally possess a controlled substance.  You will not possess

2    a firearm or other destructive device.  You will cooperate in

3    the collection of DNA as directed by Probation.

4         There are standard conditions 1 through 13 that are

5    imposed in virtually every case involving supervised release.

6    I will impose those.  I will also impose the following special

7    conditions:  First, that you shall provide the Probation office

8    with access to any requested financial information.  You shall

9    not incur new credit charges or open additional lines of credit

10   without the expressed permission of your Probation officer.  I

11   will direct that you participate in an alcohol treatment

12   program and that that program and your supervision will include

13   testing by a Breathalyzer at the direction of the Probation

14   officer or the treatment provider to determine whether you have

15   reverted to the use or abuse of alcohol.  You will participate

16   in a mental health program approved by U.S. Probation Office

17   along the lines of what you are receiving now.  You will

18   continue to take any prescribed medications, unless otherwise

19   instructed by a health care provider.  You will contribute to

20   the cost of services rendered that are not covered by

21   third-party payment.  So to the extent you can defer the cost

22   of those services, you will be expected to pay them.  If you

23   can't then the government will bear the expense of those

24   programs.  It is important that you get the programs.  I will

25   authorize the release of psychological and psychiatric

18J6GULS

1   evaluations and reports to the health care provider and from

2   the health care provider to Probation.  There is a free flow of

3   information between Probation and health care provider.

4        You will be supervised in the district of your

5   residence, which is for now Southern District of New York.  I

6   assume that will continue unless you move to Brooklyn or

7   someplace.  Let them know and you can transfer supervision.  I

8   am not going to impose restitution, which is not applicable.  I

9   will impose a fine of $32,500.  I will also order that you

10  forfeit the $1,103,131 that is set forth in the order of

11  forfiture and the plea agreement.  There is a $200 special

12  assessment, which I said $100 for each count.  That is the

13  sentence.

14        I will allow you to voluntarily surrender.  I will

15  give you 60 days so the Bureau of Prisons can make a

16  designation and you can report to that facility which will

17  hopefully be a facility in the New York area.  I will make that

18  recommendation strongly.  I will also request or recommend that

19  you be at a facility that will enable you to take advantage of

20  a substance abuse program.  That will be up to the Bureau of

21  Prisons.  I will make that recommendation.  The benefit of such

22  program is that it could reduce your sentence and certainly

23  will provide you with the kind of care that will be useful to

24  you going forward.  I will also recommend that you receive

25  mental health treatment while in custody and that be designated

18J6GULS

1    at a facility that can best provide those services to you.  So

2    I will direct that Dr. Kirwin's report be made available to the

3    Bureau of Prisons so that they can take into account her

4    findings, recommendations and then tailor your designation to

5    your needs with respect for mental health treatment.

6              Are there open counts, Mr. Tarlowe?

7              MR. TARLOWE:  Yes, your Honor.  The government moves

8    to dismiss the underlying indictment as well as Counts and 11

9    of the superseding indictment.

10             THE COURT:  I will dismiss those counts.

11             Mr. Goldfarb, you have a right to appeal this sentence

12   to the extent you haven't already waived it.  If you wish to

13   appeal you need to do so within two weeks from today.  If you

14   wish to appeal, talk to Mr. Soshnick and he will help you with

15   filing the notice of appeal.  The notice of appeal will need to

16   be two weeks obviously.  After that there will be a schedule

17   for the appeal briefs.  If you cannot afford to pay the filing

18   fee, talk to Mr. Soshnick.  There is a form you can fill out

19   that will result in the fee being waived.

20             Mr. Soshnick, anything else you wanted me to

21   recommend?

22             MR. SOSHNICK:  Yes.  I would ask you making a specific

23   recommendation as to the camp at Fort Dix.

24             THE COURT:  Camp at Fort Dix.  I don't mind making

25   that recommendation.  Ultimately it is up to the Bureau of

18J6GULS

1   Prisons.

2           MR. SOSHNICK:   I understand.

3           THE COURT:   I am familiar with that camp.   It is open.

4   It is close.   It is a pretty good facility.   There may be

5   others that the Bureau of Prisons thinks are appropriate in

6   light of the recommendations and other things they may have to

7   consider.   I will leave it to them, but I will make the

8   recommendation.

9           Mr. Goldfarb, let me finish by saying this:   Ms. Hart

10  said you are a special person.   I absolutely share that view.

11  You are a good, decent person.   This is a crime that has to be

12  punished.   I explained my reasons for this sentence.   I think

13  it is an appropriate sentence in light of all those reasons.

14  It doesn't diminish my view that you are a person of talent, a

15  person of quality.   You are a person who has the ability and a

16  great future in front of you.   It may not be as a lawyer as a

17  result of this conviction, but it certainly can and I think

18  should include many of the qualities that we're talking about

19  today, the ability to connect with people, the ability to

20  understand what they are going through and to help them in a

21  way that many other lawyers clearly didn't do in this case in

22  their cases.

23           So don't lose sight of that fact.   This crime does not

24  define you.   This crime was a bad one and a serious one.   I

25  probably find it more serious than you and others here today by

18J6GULS

1    virtue of what they have been asking for.  But it doesn't

2    define you.  There is much, much more to you than this.  You

3    will be released.  You are a young man.  When you get out, you

4    will resume your life, you will resume your relationships and

5    you will make something of yourself.  You will continue to make

6    something of your life.  What happened here today doesn't

7    discount everything you have done in your life.  It doesn't.

8            You should be proud of what people said about you here

9    today.  It is true and it is not something that people say

10   about everyone.  You have earned it.  The fact that you have to

11   now endure this punishment, doesn't mean that you are not

12   capable of great things going forward.  It is my hope that you

13   will have a happy life, a full life and a life that is worthy

14   of your talents.  You deserve this.  Everyone in this room

15   deserves that.  I have no doubt the sentence I have imposed is

16   one that is one that makes you unhappy, that you don't agree

17   with what I determined here.  But I think you do agree on what

18   I said last, which is that you do have a future and it is a

19   future that can be a great one if you want it to be.  So I hope

20   you will do that.

21           Thank everyone for coming here today.  You may walk

22   out of here saying you disagree with the sentence I imposed.  I

23   respect that.  I hope you will respect my decision and the

24   decision-making process.  I hope as I said before at least you

25   will agree that this was not a callus, reflexive or thoughtless

18J6GULS

1    process.  I put a great deal of thought into it.  I did in my

2    judgment what was the right thing.  I hope you will continue to

3    be there for Mr. Goldfarb.  He will need you more or as much as

4    ever.  The fact that he will be separated from you for a time

5    does not mean you will not still be important to him.  A

6    relationship is a two-way street.  Prison doesn't mean it will

7    end.  They don't have to be destroyed.  And in fact sometimes

8    they will grow.  My hope is that they will grow.  I ask you to

9    do your part.  I commend you for it and I am moved by it, but I

10   hope you will not -- let me put this way, I hope you will

11   continue to be there.  He is a person who needs it and he is a

12   person who deserves it.

13            Let me thank the court reporter who has been working

14   nonstop.  Let me thank the lawyers.  Mr. Soshnick, you put

15   tremendous effort into this proceeding and that wasn't lost on

16   me, Mr. Soshnick.  Thank you for doing that.  Thank you

17   Mr. Tarlowe as well.  With that, I bid you good day.

18            MR. SOSHNICK:  Your Honor, thank you for all your

19   time.  I know you spent a great deal of time on this matter and

20   struggled with it and we thank you for your words of

21   encouragement that you just gave to my client.

22            THE COURT:  Thank you.

23            Good luck to you, Mr. Goldfarb.

24                            o0o

25